(No. 43686.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT RUSSELL DUKETT *et al.*, Appellants.

*Opinion filed January 23, 1974.—Rehearing denied March 28, 1974.*

Paul Bradley, Deputy Director, and Robert E. Davison, Assistant District Defender, of Illinois Defender Project, for appellants.

William J. Scott, Attorney General, of Springfield, and Joseph Cavanaugh, State's Attorney, of Springfield (James B. Zagel and Charles H. Levad, Assistant Attorneys General, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

On June 29, 1970, Robert Russell Dukett and Michael Wayne Dukett, his son, were found guilty in the circuit court of Sangamon County of the armed robbery and murder of a service station attendant. On July 14, 1970, following the jury's recommendation, both defendants were sentenced to death by the trial court. Robert Dukett was sentenced to a term of 25 to 40 years on the robbery conviction and Michael to a term of 15 to 30 years.

The crimes were committed early on December 19, 1969, at an automobile service station located near Route 66 in Glenarm, approximately 12 to 14 miles south of Springfield. The evidence at trial showed that the station attendant, David Burch, had been killed and that $492 and a .12-gauge shotgun had been taken. The victim had a shotgun wound in the right arm and a bullet wound in the head from a .38-caliber revolver.

A pathologist testified that death occurred between 2:00 and 3:00 A.M. The body was found by Anthony Johnson, a motorist, who had stopped for gas. Susan Komar, a ballistics expert, testified that the bullet which killed Burch came from a .38-caliber Iver Johnson revolver which was introduced into evidence by the People. She also testified that wadding and pellets removed by the pathologist from the body had been fired from a .12-gauge shotgun, but that she did not have sufficient physical evidence to form an opinion whether they had been fired from a particular shotgun.

It was shown by the prosecution, and was conceded by the defense, that the defendants, on January 2, 1970, and on December 26, 1969, had possession of the revolver used in the murder, and also that on December 26, 1969, they had the shotgun that had been taken from the service station. There was other testimony that on December 6, 1969, two weeks before the murder, the defendants had a revolver described as similar to the revolver used in the murder.

Henry Shanklin testified for the State that on December 26, 1969, at about 3:15 A.M., he had gone with the defendants to the home of Robert Dukett to pick up a shotgun he had asked to borrow for hunting. The defendants gave him the shotgun, he testified, but before doing so sawed off its barrel and stock with a hacksaw. While at the house the witness observed Michael Dukett take a revolver from his pocket and remove the shells. The witness identified the murder weapon, which was intro-

duced by the People, as the revolver the son had that night. The witness testified further that he had seen the father with that revolver or one like it on December 6, 1969. The witness and the defendants were at the Blue Sapphire, a tavern in Springfield, he stated, when a fight broke out between two other patrons, Blackie Morgan and Joe Wright. He had seen Robert Dukett, with the revolver in his hand, walk over to where the fight was taking place.

Harry Perry, the bartender, also testified to having seen a revolver in Robert's possession that night. Robert had used it to break up the fight, but the witness said he did not have a clear enough view of the weapon to give a closer description of it.

Roxie Grey testified that on the morning of January 2, 1970, she had seen the defendants with a weapon that "looked something like" the murder weapon at Reed's Jewelry Store in Decatur where the witness was employed. As will be explained later, the witness had seen the gun in the course of a robbery committed at the store by the defendants.

James R. Thompson, a police officer of the Decatur Police Department, and Bertha Taylor, of Decatur, testified that the defendants had been found hiding in the basement of the Taylor home on the morning of January 2, 1970, following the robbery at the jewelry store.

Luther Taylor, the husband of Bertha Taylor, testified that he had found a revolver in the coal bin of their basement on the afternoon of January 2, 1970, and that he had immediately informed the police of this. Michael Dukett admitted having left the weapon in the coal bin.

Evidence was also introduced to show that the defendants had a need for money. There was testimony that neither defendant was employed on December 18 and 19, and that Michael Dukett had called his former wife on December 10, 1969, asking unsuccessfully for money. Evidence was also introduced that on December 19, 1969, the defendants had money and purchased a number of

items in St. Louis, such as phonograph records, shoes for Michael, and several shirts.

The prosecution introduced evidence of admissions made by Michael Dukett to a cellmate, Richard Curran, during the evening of June 25, 1970. During the cross-examination of Michael Dukett, the prosecutor, after calling the defendant's attention to the testimony of Susan Komar that the shotgun pellets in David Burch's right arm came from a .12-gauge shotgun, asked Michael Dukett: "Did you say to Mr. Curran or in his presence this or this in substance: That Miss Komar was wrong about those shotgun pellets. They weren't .12-gauge shotgun pellets; they were .16-gauge, and I pulled the trigger?" Michael denied making the statement.

Curran, when called as a rebuttal witness for the State, testified substantially that Michael Dukett had said to him: "That it wasn't .12-gauge. I'm sure it wasn't .12-gauge. If anybody knows, I know."

Evidence of another admission Michael Dukett made was brought out by the prosecutor during cross-examination. Michael was asked if he had told Curran on June 29, 1970, that he could drive from St. Louis to Springfield in 55 minutes, to which Michael answered that he had not. Michael Dukett stated Curran had told him that Curran could make the trip in 55 minutes.

Curran testified that he had told Michael Dukett of having driven 110 miles per hour the last time he had driven to St. Louis from Springfield. He said that Michael then asked how long it had taken him to drive there and that is when he responded that he hadn't timed the trip, Michael said, "You could make it in 55 minutes—that fast."

Larry Hibbs, who was an inmate of the same cellblock as Michael Dukett and Richard Curran, testified for the defense that he heard all conversations between Michael and Curran the evening of June 25, 1970, and that Michael did not make the admissions in question.

Robert Dukett did not take the stand but Michael did testify. Michael admitted having the murder weapon on December 26, 1969, and January 2, 1970, and acknowledged that he had left the revolver in Luther Taylor's coal bin. He also admitted sawing off the barrels and stock of the shotgun, as Shanklin had testified, but he said he had done so at the request of Shanklin.

Michael claimed, however, that he and his father did not have the weapons until December 22 and 23, 1969, when they were given them by Blackie Morgan in Chicago. Michael testified that Blackie was an acquaintance whom they had driven to Chicago as a favor, and that he had not seen Blackie since December 23, 1969. Other testimony was introduced that Morgan had died in New York on March 25, 1970.

Testifying in regard to the events of December 6, 1969, Michael stated that he and his father had met Blackie and Blackie's girl friend, Rose Wright, outside the Blue Sapphire and that Blackie had handed him a revolver similar in appearance to the one Blackie gave him on December 23, 1969. Michael was not certain it was the same weapon.

Later in the evening of December 6, when a fight between Blackie Morgan and Joe Wright began, Michael gave the revolver to his father, who moved to where the men were fighting. Michael did not observe what then happened, he said, but he observed that the fight stopped and he saw his father return the weapon to Blackie.

Rose Wright was a rebuttal witness for the State. She stated that she did not see either a revolver or a shotgun in Blackie's possession on December 6, 1969, but she testified that she had seen a revolver in his possession in January, 1970. She also testified that Blackie was in Chicago between December 15, 1969, and December 20, 1969, but she acknowledged on cross-examination that she could not be certain that he did not visit the Springfield area during that period.

Joe Wright testified for the People that he had been involved in the described fight with Blackie Morgan, that Blackie had struck him in the face with a shotgun, and that Robert Dukett had a revolver which he used to break up the fight. Wright was unable to describe or identify the weapon.

Testifying to the defendants' actions on the night of December 18-19, 1969, Michael stated that he and his father had been "bar hopping" in St. Louis and that after leaving a Carioca Bar at about 1:10 to 1:15 A.M., they purchased a bottle of wine from a nearby liquor store.

Robert Ruggens, the owner of a liquor store in St. Louis, testified that Michael had come to his store at about 1:10 to 1:15 A.M. on December 19, 1969, and that he had remained long enough to purchase a bottle of wine, approximately four to five minutes.

After leaving the liquor store, Michael testified, he and his father drove towards East St. Louis, but when they were unable to locate a tavern they had intended to visit, they decided to drive to Little Rock, Arkansas, to visit a friend with whom Michael had served in the armed forces. After driving about 20 to 25 miles beyond Festus, Missouri, they turned back toward Springfield, Illinois. Because Michael was tired, they spent the night in a motel in East St. Louis, checking in at approximately 3:45 to 4:00 A.M. On cross-examination Michael testified that he had registered at the motel under a fictitious name, which he did not recall, but that he had correctly registered the license number of the auto he was driving.

In rebuttal the State introduced the registration card signed by Michael and the testimony of two clerks at the motel. The card showed a registration in the name of Bob Welch. It bore the license number of the auto Michael drove, and indicated the check-in time as 5:00 A.M. Otis Page, a desk clerk, testified that the time had been stamped on the card when it was placed under an electric clock.

Other testimony was introduced by the defendants that the clock was not always accurate, that there had been a power failure at the motel on the night of December 18-19, and that the clock had not been reset before the defendants checked in. However, Robert Bornshears, another desk clerk, testified that between 5:00 and 5:30 A.M. he had assisted in opening Michael's motel room door after Michael had returned to the desk and informed him that he had been unable to open the door.

Contrary to the defendants' contention we consider that the evidence was sufficient for the jury to find guilt beyond a reasonable doubt. We observed in *People v. Bernette* (1964), 30 Ill.2d 359, 367:

"*** a conviction may be sustained upon circumstantial evidence as well as direct evidence, (*People v. Russel,* 17 Ill.2d 328,) it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Magnafichi,* 9 Ill.2d 169; *People v. Grizzel,* 382 Ill. 11.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt. (*People v. Franklin,* 341 Ill. 499; *People v. Judycki,* 302 Ill. 143.)"

The only offered support of the alibi testimony of Michael Dukett was the testimony of Robert Ruggens, the liquor store owner, who stated that Michael was in his store between 1:10 and 1:15 A.M. on the night of the murder. But the pathologist who examined the victim's body testified that death occurred as late as 3:00 A.M., which would have provided time for the defendants to

drive from the liquor store to the service station in Glenarm. Michael's claim that the defendants checked into the motel in East St. Louis at 3:45 A.M. to 4:00 A.M. was contradicted by the testimony of the desk clerk and by the stamp on the registration card showing the check-in at 5:00 A.M.

Too, contrary to the claim of Michael Dukett that the defendants were given the shotgun and revolver by Blackie Morgan after the shooting, there was evidence from which the jury could have concluded that the defendants had possession of the murder weapon on December 6, 1969, at the Blue Sapphire Tavern, two weeks before the murder.

The defendants complain, too, that they were prejudiced by the closing argument of the prosecution and also by the prosecutor's cross-examination of Michael Dukett.

In his closing argument, the defendants say, the prosecutor argued facts which were not in evidence. But no objection was made to any of the prosecutor's alleged misstatements of the evidence and, of course, a party who fails to object to claimed error committed during trial waives the right to urge the claim on appeal. (*People v. Woods* (1961), 23 Ill.2d 471, *cert. denied,* 370 U.S. 910, 8 L. Ed. 2d 404; *People v. Ford* (1960), 19 Ill.2d 466, *cert. denied,* 364 U.S. 848, 5 L. Ed. 2d 72.) Apart from this, we would note that we have examined the record and find that in any event the final argument complained of did not go beyond inferences that might reasonably be drawn from the evidence.

Citing *People v. Gregory* (1961), 22 Ill.2d 601, the defendants complain that error was committed when the prosecution referred in argument to the family of the victim. In *Gregory* the prosecutor made an extended argument about the victim's wife and three children. The family reference here, however, was merely: "[W]e want justice for David Burch and we want justice for David Burch's family and his friends." There was no objection in the trial court by the defendants and we will not on appeal consider this claim of error.

A more disturbing charge of error is based on the defendants' claim that they were prejudiced by the following portion of the prosecutor's rebuttal argument:

> "Well now, you see, we've got introduced in this case a racial issue. We've got introduced in this case a racial issue. We've got a couple of white men who go to the Negro bars. We've got a couple of white men who go out of town, who go to the Negro bars.
>
> I think that we could say on the basis of that a person who frequents those kind of places is going to be a person different than reasonable persons—than a reasonable person. I think we can say that a person who goes into those kind of places is a kind of person who would carry a pistol into those places, and if there was trouble the first thing he'd go for would be his pistol or shotgun or any other weapon that he had.
>
> And isn't that what happened on December 6th? As soon as Duketts' friend, Blackie Morgan—friend—and I would think that you would at least have to be a friend to stake your life or your safety on a fight in a tavern at twelve o'clock at night or one o'clock in the morning between two blacks over some problem they had."

They also complain of this comment by the prosecutor which followed: "Now, it's interesting to note for me the fact that two Negroes were brought from St. Louis to testify ***." There was no objection to the remarks when made but they were cited as prejudicial error in the defendants' motion for a new trial. The defendants acknowledge that their failure to make timely objection would in an ordinary instance preclude them from claiming error on appeal, but they urge that we should consider them despite the absence of objection. The comments were improper and we take cognizance of them as plain error. No one will question that appeals to racial prejudice, whether open or oblique, discredit our justice and are to be condemned. But not every improper argument will result in the reversal of a conviction. This court has said: "Where it appears that improper remarks do not constitute a material factor in the conviction *** the verdict will not be disturbed." *People v. Berry* (1960),

18 Ill.2d 453, 458. See also *People v. Stahl* (1962), 26 Ill.2d 403.

Considering all of the evidence in this record we do not judge that the improper remarks constituted a material factor in the conviction of these defendants. We would add that the trial court considered the remarks had no effect on the jury's verdicts. In denying the defendants' motion for a new trial, the trial court observed: "The Court is not certain of the purpose of this line of argument, but I strongly feel, because of the noticeable adverse reaction of the jury during this argument, that it had no effect on their verdicts. This was confirmed in subsequent conversations with jurors."

Another contention is that the court erred in refusing to permit the defendants to present this question to prospective jurors: "[If] more jurors felt the other way, whichever it was, would you let the fact that you were in the minority of the jurors influence you in reaching your verdict?" When defendants' counsel asked this question, the prosecutor objected, saying that "questions should not encourage jurors not to arrive at verdicts ***." Sustaining the objection, the trial court ruled that defendants could ask the jurors if they would listen to the evidence and render judgment based upon the application of law to facts. We do not judge the trial court erred. The question could be interpreted as suggesting that a juror's position upon the question of a verdict should be unchanging. In a resembling situation the Court of Appeals for the Second Circuit observed in *United States v. Gillette* (2d Cir. 1967), 383 F.2d 843, 849: "*** such questions were improper in view of a juror's right to change his mind and duty to reconsider his initial impressions, as well as the presumption that jurors will obey the court's instructions concerning reasonable doubt."

The defendants' next complaint of error is that there was a misstatement by the prosecutor of what Michael Dukett allegedly said to Richard Curran. The prosecutor

asked Michael Dukett on cross-examination if he had not said to Curran, who occupied the same cellblock: "Did you say to Mr. Curran in his presence this or this in substance: that Miss Komar was wrong about those shotgun pellets. They weren't .12-gauge shotgun pellets; they were .16-gauge, and I pulled the trigger?" When Curran later testified regarding the statement he said: "That it wasn't .12-gauge. I'm sure it wasn't .12-gauge. If anybody knows, I know."

We do not consider that under the circumstances there was prejudicial error because of the variance. No objection was made to it at trial by the defendants. Whether this was because the defendants at the time regarded the answer as unobjectionable in view of the "in substance" qualification in the prosecutor's question we do not know. In any event, not having objected at trial, the defendants cannot urge it as error on appeal. (*People v. Woods* (1961), 23 Ill.2d 471.) We would note that there is nothing to suggest any intentional misstatement by the prosecutor. An examination of the transcript of trial discloses that the prosecutor apparently attempted to prod the memory of the witness and bring out what the witness omitted in his answer. Suggestive of this, the transcript shows that after the witness had testified that Michael had said it wasn't .12-gauge and he (Michael) knew it wasn't .12-gauge, the prosecutor asked, "Did he say anything else in reference to that?" and followed with another question, "Do you remember his exact words?" At this point the defendants' counsel objected. The court overruled the objection and the witness said again: "That it wasn't .12-gauge. I'm sure it wasn't .12-gauge. If anybody knows, I know." In any event, as testified to by Curran, what Michael Dukett said to him was certainly incriminating—it was an admission of his knowledge of the gauge of the shotgun used to kill David Burch.

The defendants also complain that they were prejudiced by the reference to an extra-indictment offense in

the testimony of Roxie Grey, who testified that she had seen the defendants in Reed's Jewelry Store on January 2, 1970, and that Robert "was leaning across the counter with the gun." Later in her testimony she was asked if she had seen Robert with the murder weapon at another time, to which she responded: "Yes, when they were tying us up, they came back to get the pistol." The witness testified that the revolver in evidence resembled the gun Robert Dukett had in the jewelry store. Prior to testifying Mrs. Grey had been instructed by the prosecutor and the trial court to testify only as to whether she had seen the defendants with the gun in the store, and, if so, to describe the gun. The defendants objected to the statement of being tied up, and their objection was sustained and the jury instructed to disregard it. The court denied the defendants' motion for a mistrial made after Mrs. Grey had testified.

Citing *People v. Gregory* (1961), 22 Ill.2d 601, the defendants argue here that Roxie Grey's stricken comment constituted an improper reference to an offense unrelated to the crime with which they were charged, that the cautionary instructions given by the trial court did not cure the error, and that it was therefore error to deny their motion for a mistrial.

*People v. Gregory* (1961), 22 Ill.2d 601, which the defendants cite, does not govern what occurred here. In *Gregory* there was an extended reference to the defendant's other crimes in a confession given by a co-defendant which was read to the jury. Without considering whether evidence of the extra-indictment offense could have been admitted (see, *e.g., People v. Armstrong* (1968), 41 Ill.2d 390), we judge that the trial court's prompt direction to the jury to disregard was adequate remedial action. There was somewhat similar prejudicial testimony in *People v. Wilson* (1972), 51 Ill.2d 302, 308-309, when a co-defendant, "in response to questions about conversations with the defendant and the other co-defendant, responded that

there was some conversation about the defendant having a record in California and having been in the penitentiary." We said in response to the defendant's argument that his conviction should be reversed: "*** such error does not require reversal in that the trial court properly instructed the jury to disregard the answer."

The defendants argue, also, that they were improperly prejudiced by the introduction of evidence establishing facts not pertinent to their defense of alibi. They complain that too many witnesses were permitted to testify regarding the identification and chain of custody of the shotgun that had been taken during the robbery; that certain scientific evidence pertaining to the scene of the crime, but not linked to the defendants, was erroneously admitted; and that they suffered improper prejudice through the admission of inflammatory exhibits, including photographs of the victim, the victim's clothing, and a specimen of blood taken from the victim's body.

The argument that the State could not introduce certain evidence, such as evidence establishing the crime, because the defendants did not deny that the crime had taken place was considered by this court and rejected in *People v. Speck* (1968), 41 Ill.2d 177. We quoted from *People v. Scheck* (1934), 356 Ill. 56, 62: "It has never been held that the State is barred from proving a fact because the defendant offers to admit it, but, on the contrary, the rule is that when a trial is upon a plea of not guilty the State is permitted to go ahead and introduce its full proof of the crime charged in the indictment." There was no offer by the defendants to stipulate in any manner, unlike the situation in *Speck,* and their contention thus is less persuasive than the argument rejected in *Speck.*

The defendants' complaint against the introduction of the photographs, the clothing, and the blood also does not persuade. We said in *People v. King* (1963), 29 Ill.2d 150:

"All evidence concerning 'the physical facts and circumstances showing a killing are admissible in

evidence as tending to throw light on the transaction and to reveal the nature' of the crime. (*Williams v. State*, 154 Tex. Crim. 138, 225 S.W.2d 836.) Also all facts of the crime which show the aggravated nature of the offense are relevant to the punishment to be set by the jury. *Nowacryk v. People*, 139 Ill. 336."

The condition of the clothing tended to corroborate other testimony that the victim had been shot once with a shotgun and once with a .38-caliber revolver. The blood was admitted in connection with the testimony of a crime-laboratory analyst that blood on the victim's clothing was of the type "O", the same type as blood in a vial taken from the body of the victim. There was no objection to the introduction of the vial.

Neither do we find error in the State's introduction of several photographs of the victim's body taken at the scene of the crime. In *People v. Kolep* (1963), 29 Ill.2d 116, 124, we upheld the admission of photographs where they tended to show the "amount of force that had been used." Here, the State had asked the jury to recommend the death penalty and the character of the murder was certainly relevant to that request of the prosecution.

Citing *People v. Lettrich* (1952), 413 Ill. 172, and *Chambers v. Mississippi* (1973), 410 U.S. 284, 300-02, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1049, the defendants also contend that the trial court erroneously excluded testimony tending to show that another person committed the crime.

At a hearing on this proposed testimony outside the presence of the jury, James Basford, a former acquaintance of the victim, testified that several months before the crime he had fired a blank cartridge in the direction of the victim, burning the victim's jacket, and that three months before the crime he had told the victim that he should have his "block knocked off." As Basford testified to the latter incident:

"Well, I'd been—uh—working on my car earlier, and I was tired and disgusted, and I went to the Shell Station to get me a soda. And when I walked in—uh—he made a smart remark about the way I looked in my car. And, like I said, I was just tired and disgusted and just told him in that tone—in that manner--
Q. Did he say anything in reply?
A. Just laughed.
Q. What happened after that?
A. I got my soda and talked for a little bit and then left."

Basford also testified that after the shooting he was asked by a friend, Robert Hayes, if he had been involved, and that he replied: "Well, I told him I didn't know if I was or wasn't." Under cross-examination Basford explained the statement:

"Q. Was there any conversation after that you said, 'I don't know whether I was or was not involved'?
A. Not that I can remember, not about the Burch case.
Q. Why did you say that to Mr. Hayes? ***
THE WITNESS: Uh—well, I was—like I started to say, I was trying to be smart and just—you know, kind of smart way—tell him to shut up, and he took the hint and didn't say anything else about it."

Basford also denied any involvement in the crimes concerned here.

The other excluded testimony was that of Charles Miller, chief of police of Pawnee, who stated outside the jury's presence that in the weeks following the shooting Basford had on three or four occasions inquired about developments in the case and asked whether he had been cleared of suspicion.

It was this testimony whose exclusion the defendants challenge. But there is nothing in the testimony of either Miller or Basford to connect Basford with the shooting of David Burch, which occurred during a robbery of Burch. At most the proposed testimony showed that Basford and the victim disliked each other and that Basford was concerned that he would be accused of the crimes.

This court in *People v. Nitti* (1924), 312 Ill. 73, 90, remarked:

> "One accused of crime may prove any fact or circumstance tending to show that the crime was committed by another person than himself. [Citations.] It is, of course, difficult, in dealing with evidence of this character, to define the precise limits which must control its admission. If it is too remote in time to throw light on the fact to be found it should be excluded. [Citations.]"

As circumstances that are "too remote in time to throw light on the fact to be found [must] be excluded," so, too, under the circumstances the testimony here of personal dislike between the victim and Basford was properly excluded because it would have been entirely speculative in character.

*Lettrich* (1952), 413 Ill. 172, and *Chambers* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, are not applicable to this case. In *Lettrich,* we relaxed the rule against the admission of hearsay, holding that the trial court had erroneously excluded testimony that a third person had confessed his guilt to the county psychiatrist. It should be noted that in *Lettrich* the only evidence of the defendant's guilt was a confession, later repudiated, obtained after the defendant had been interrogated for 60 hours and had not had the assistance of counsel.

In *Chambers* it was held that the trial court had improperly excluded the testimony of three persons that a witness who had testified in the case had orally confessed his guilt to each of them shortly after the murder. In reaching this conclusion, the court stated: "[W]e establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court

deprived Chambers of a fair trial." 410 U.S. at 302-3, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049.

It is clear that the proposed testimony of Basford and Miller cannot be equated with the "special circumstances" in *Chambers,* where evidence was available that a person other than the defendant had confessed to three persons that he was guilty of the crime involved.

The defendants next claim they were prejudiced by giving an accountability instruction on the ground that the evidence did not warrant the giving of such an instruction. The instruction was:

> "A person is legally responsible for the conduct of another when either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense."

We do not find merit in the argument. Even if the ground of the defendants' objection is to be considered applicable under the circumstances of this case, there was sufficient evidence from which the jury could find both defendants guilty as principals. We observed in *People v. Clements* (1963), 28 Ill.2d 534, 540, where a like claim of error was made:

> "The law of this State is that there is no distinction between an accessory before the fact and a principal, and both may be punished in the same manner. Therefore, prejudicial error could not have resulted to the defendant in the giving of the questioned instruction."

The defendants next claim there was error in the sentences imposed.

We uphold their contention as to the sentences of death. Under the decision of the United States Supreme Court in *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562, and *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, these sentences cannot here be carried out. The sentences must

be vacated and we shall remand the cause for resentencing under the murder convictions.

On the armed-robbery convictions, Robert Dukett received a sentence of 25 to 40 years and Michael a sentence of 15 to 30 years. The defendants contend that the sentences are excessive and that the court improperly considered their conviction of crimes committed by them after the armed robbery and murder concerned in this appeal. They say that although past convictions may ordinarily be taken into account by the sentencing judge because they give an "idea of how the person reacts to the rehabilitation offered by the State ***, these convictions for subsequent crimes relate only to the defendants' character, since they have not yet served their sentences."

However, the defendants take too narrow a view of what factors a court with the responsibility of sentencing may consider. As this court stated in *People v. McWilliams* (1932), 348 Ill. 333, and reaffirmed in *People v. Adkins* (1968), 41 Ill.2d 297, the sentencing court "may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, [and] the stimuli which motivate his conduct ***."

Neither do we find persuasive the defendants' separate argument that the sentences for armed robbery are in any event excessive. The defendants base this claim upon favorable information concerning the defendants' family background, employment record and involvement in community affairs that was brought out in the hearing on aggravation and mitigation.

We do not consider the sentences excessive. The convictions of robbery were hardly considered in isolation by the trial court. They were bound up with the convictions of murder. The sentences were within the statutory limits, and our observation in *People v. Crews* (1967), 38 Ill.2d 331, that "*** a trial court typically is in

a position superior to a reviewing court to determine a punishment which will be appropriate" is applicable here.

For the reasons given, the judgments of conviction of the circuit court of Sangamon County are affirmed. The sentences of death on the convictions of murder, however, are vacated and the cause is remanded to the circuit court with directions to conduct a new hearing in aggravation and mitigation and to resentence the defendants.

*Affirmed and remanded, with directions.*