THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JEROME COLLINS, Defendant-Appellant.

First District (1st Division) No. 77-505

Opinion filed August 14, 1978.

James J. Doherty, Public Defender, of Chicago (James H. Reddy and Kathy Wengelewski, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James Veldman, and Kathleen M. McGury, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a bench trial, Jerome Collins (defendant), was found guilty of indecent liberties with a child. (Ill. Rev. Stat. 1973, ch. 38, par. 11—4.) He was sentenced to 10 to 30 years. He appeals.

In this court, defendant contends only that the State has failed to prove beyond a reasonable doubt that a lewd fondling or touching occurred and that such touching was done by the defendant with the specific intent of arousing or satisfying his sexual desires. A factual statement is essential.

The case involves an infant child some 5 weeks old. The mother of the infant was Jacqueline Miller and the father was Ed Levy Steele. Alice Miller, grandmother of the infant, testified that she was at home on August 7, 1974. About 10 o'clock that evening those also present in the home were twin sisters named Gail and Vail Adams, Brenda Carter, Gail Rogers, the mother of the infant and the defendant. The witness saw the baby on the bed in the bedroom shortly before 10 p.m. At that time the mother changed the baby's diaper. Some 5 minutes later the mother and all of the other persons but defendant and the witness left the house together to purchase some food. The witness put some chicken onto the stove and went out to the front stoop where she sat with a friend named Wallace Gullett. At that time defendant was in the living room some 10 feet from the infant's bedroom.

About 15 minutes later the witness reentered the house. She saw defendant in the bedroom sitting on the bed some 5 feet away from the infant. She returned to the front stoop. Shortly thereafter the mother and her companions returned. The mother came to the front and told the witness to come look at the baby which was bleeding. She did and found the baby bleeding from the vaginal area. Defendant told the mother that the baby was wet and needed changing and a few seconds later he said that the baby was bleeding. Shortly thereafter defendant went into the washroom and closed the door. The police were called and the infant was taken to the hospital. On cross-examination the grandmother also testified that two other men named James Carter and Carl Beck were not present at the home that evening. During that entire day she had "one shot of vodka and orange juice."

Jacqueline Miller, the mother, corroborated this testimony. She added

that when she first saw the baby upon her return its outer pants had been removed and "one side of the diaper was loose." On cross-examination she testified that her mother was not drunk at the time; the defendant did not enter the washroom and that James Carter and Carl Beck had been outside the gate but did not enter the home. She also testified that Brenda Carter and Gail Rogers had left with the group to buy food but had not returned to the home.

The parties stipulated that if a qualified physician were called he would testify that he had examined the infant, 43 days old, at the hospital emergency ward at approximately 10:30 p.m. that day. He found external and internal damage done to the vaginal area of the infant, and, in his opinion, this damage could only have been done by external trauma resulting from penetration or attempted penetration of the vaginal area.

The defendant first called police investigator John Herman. He testified that he was uninformed regarding any physical inspection of the defendant when arrested.

Defendant called Vail Adams, one of the twins. She testified that the group had left the home for food about 7:30 or 8 p.m. They were gone about 40 minutes. When they left they saw James Carter and Carl Beck "just coming in." When the police came, after the group had returned, Beck and Carter were present. She testified that at 9 p.m. Alice Miller, the grandmother, was drunk. On cross-examination she stated that she was the "girlfriend" of the defendant. Neither she nor her sister Gail wanted the defendant to go to jail. She never told the mother of the infant that the defendant had "done it." She knew that it would help defendant if she said others were in the home at the time.

Gail Adams testified that she went to the home about 6 p.m. with her sister Vail, Gail Rogers and the defendant. The group went to obtain food and were gone about 40 minutes. As they were leaving Beck and Carter "came in." When the group returned and when the police arrived, Beck and Carter were still there. The infant's grandmother was drinking heavily and was drunk. On cross-examination the witness stated that she and Vail had been girlfriends of defendant but presently were not. She had spoken to defendant about the case more than 10 times but not more than 20 times. She and her sister had talked to defendant about it on the morning of her testimony. She did not remember if at the hospital she told the mother of the infant that she did not know why defendant "would do something like this."

Defendant testified that he came over to the house about 6 p.m. that day with the twin sisters and Gail Rogers. As they left to buy food, Carl Beck and James Carter came into the house. They were there when the police came. At one point, defendant went out to a store some four doors away and bought potato chips and pop. The store was not there any more

at the time of trial. Also, Ed Levy Steele and his brother John Steele had been present at the home. Alice Miller, the grandmother of the infant, had been drinking and was drunk. He described himself as a boyfriend of Vail Adams. Defendant denied that he had ever sat on the bed with the baby; or that he was coming out of the bedroom when Jacqueline Miller, the mother, came in. He told the police that the mother had left him in charge of the baby. On cross-examination he denied telling a police officer that he had held the baby on his chest while he was lying down in the bedroom. He added that the police did not ask him how the baby got hurt. Defendant also testified that upon his arrest the police required him to pull down his pants and shorts and they inspected his body and his hands.

Gail Rogers was present at the home that evening. She testified that Ed Levy Steele was also there. She had not seen Carter and Beck in the house that day. She left with the group to purchase food. At that time, Carter and Beck "were coming in." When they returned, she did not see Carter and Beck in the home. It was dark when the group left for food but she was not sure of the time. When they returned from buying the food, only the defendant and Ed Levy Steele were there. At that time the grandmother, Alice Miller, was out on the stoop. She testified "it looked like" the grandmother had been drinking.

On rebuttal the State called John Steele, brother of Ed Levy Steele, father of the infant. John Steele testified that he was present at the home that afternoon but he and his brother both left the home at about 3:30 or 4 p.m. Ed Levy Steele, the father, was also called on rebuttal. He came to the home about 10 a.m. with his brother John. At about 12 o'clock he and John both left. The father came back alone about 4 or 5 p.m., stayed about 5 minutes and left. He did not see Alice Miller, the grandmother, drinking.

John Herman, the same police investigator called by defendant, testified he saw defendant at the police station about 1 o'clock the next morning. After being advised of his rights, defendant stated he was in the house as a babysitter while the mother went out to get hamburgers. Defendant stated he was holding the baby on his chest while watching television. Defendant said he was in the bedroom while the mother went to the store. When the mother came home she found the baby was bleeding. Defendant stated he did not know how the infant was injured. Defendant never told him he had left the house for a while or that there were other persons in the house at the time defendant was present.

In surrebuttal, defendant testified he was arrested at the hospital. He did not see Investigator Herman at the hospital nor did he see him later at the police station. He was not questioned at the police station but only at the hospital.

As above stated, defendant attacks the sufficiency of the evidence to

prove guilt beyond a reasonable doubt only from one point of view. Defendant questions the sufficiency of the evidence to prove his intent as a specific element of the crime. The indictment charges that defendant took indecent liberties with the infant "with the intent to arouse and satisfy his sexual desires* * *." Defendant urges there is no proof of any specific intent on his part to arouse or satisfy his sexual desires but that the evidence proved only the presence of defendant in the house when the child sustained a traumatic injury.

■▌ A proper disposition of this contention by defendant requires that we consider this record from two points of view. We must determine first whether there is proof beyond reasonable doubt that defendant inflicted the injury upon the infant or, in other words, that defendant performed the criminal act. We must then consider the issue as to whether defendant performed the act with the requisite criminal intent. Conviction of the offense of contributing to the delinquency of a minor, which is here involved, requires proof of a specific intent which is an essential element of the crime. (*People v. Evrard* (1965), 55 Ill. App. 2d 270, 273, 204 N.E.2d 777, citing *People v. Freedman* (1954), 4 Ill. 2d 414, 123 N.E.2d 317.) The pertinent statute requires (Ill. Rev. Stat. 1973, ch. 38, par. 11—4(a)(3)):

> "* * * lewd fondling or touching of either the child or the person done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the person or both."

In considering these factual aspects of the case, it is necessary that we apply two principles of law. Although the evidence here is circumstantial, as opposed to direct, guilt may be established entirely by circumstantial evidence provided that the proof of circumstances is of a conclusive nature and tendency leading on the whole to a reasonable and moral certainty of the guilt of the accused. Each and every individual link in the circumstantial chain need not in itself comply with this requirement as long as all of the evidence taken together is sufficient. Circumstantial proof as such does not require proof beyond any possibility of doubt. *People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, and authorities there cited. See also *People v. Benedik* (1974), 56 Ill. 2d 306, 309, 307 N.E.2d 382, and *People v. Dukett* (1974), 56 Ill. 2d 432, 441, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.

In addition, in the process of considering the evidence as regards both act and intent, we must remember that the trial court saw and heard all of the witnesses. It was the duty of the trial court to determine the weight and credibility of the testimony and to determine whether guilt has been established beyond a reasonable doubt. The result reached by the trial court " 'should not be set aside unless the proof is so unsatisfactory as to

cause a reasonable doubt of guilt to appear.' " *People v. Reese* (1973), 54 Ill. 2d 51, 59, 294 N.E.2d 288, quoting from *People v. Walcher* (1969), 42 Ill. 2d 159, 165, 246 N.E.2d 256; see also *People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.

As regards performance of the criminal acts, the grandmother of the infant testified to a set of facts which point directly to defendant as the offender. Her testimony established that the mother changed the infant's diaper shortly before leaving the house. During this time the rear entrance to the apartment was locked. The grandmother testified that defendant was the only person in the house with the infant. When the mother returned, defendant told her, in the presence of the grandmother, that the baby was wet and a few seconds later that it was bleeding. Defendant then went to the washroom and closed the door. These facts are corroborated by the testimony of the mother. In addition, police investigator Herman testified to a statement by defendant that he was holding the baby on his chest while watching television.

As against this evidence, defendant interposed testimony by his friends Vail Adams, Gail Adams and Gail Rogers. Their testimony assisted defendant only to the extent that they attempted to raise an inference that other persons may have entered the house and performed the act. They designated Carl Beck and James Carter as possibilities in this regard. However, the mother and grandmother of the infant both deny that Carter and Beck entered the house. In addition, Gail Rogers testified that she came back to the house with the mother after purchasing food but she did not see Carter and Beck in the house but only saw them "coming in" as she left.

The defendant in his own behalf made simply a categorical denial that he had committed the act. He stated that he went to a store, which no longer exists, for the purpose of buying food. He also testified that Beck and Carter entered the house and were there when the police came. Defendant attempted to show that John Steele and Ed Levy Steele, the latter being father of the infant, were also present. However, both of these men testified to the contrary on rebuttal. Similarly, defendant's testimony attempted to attack the veracity of the grandmother on the ground that she was drinking. This evidence consisted generally of conclusory statements regarding the sobriety of the grandmother. She herself, however, stated that she had consumed one drink during that day.

■■ In our opinion, the evidence here is strong beyond a reasonable doubt to convince of the guilt of the defendant as regards performance of the act. At best we find here only issues of credibility which have been properly resolved by the trial court so that we are required to affirm.

As regards the requisite intent, defendant urges that there is no proof of specific intent regarding his intent to arouse and satisfy his sexual desires.

Defendant also cites *People v. Garcia* (1971), 3 Ill. App. 3d 365, 279 N.E.2d 741, to the effect that the statutory expression "[l]ewd fondling" necessarily implies a caress or tender handling. (*Garcia,* 3 Ill. App. 3d 365, 370.) As a factual matter, we cannot regard *Garcia* as being similar to the case before us. Of prime importance there is the fact, stressed in the majority opinion, that the trial court found defendant not guilty under the second count of an indictment for "an act of deviate sexual assault by inserting his penis into the rectum * * *" of the victim. (*Garcia,* 3 Ill. App. 3d 365, 368.) The majority in *Garcia* treated this result as an acquittal of the charge in count II. (*Garcia,* 3 Ill. App. 3d 365, 369.) Finally, we note the strong and extremely well-reasoned dissent in *Garcia* which pointed out Committee Comments supporting the result that the wording of the statute there involved, as in the case at bar, was sufficiently broad to encompass acts of deviate sexual assault or sexual intercourse and is not limited "to violations of a tender and caressing nature." *Garcia,* 3 Ill. App. 3d 365, 374.

In any event, the matter has been authoritatively disposed of by the Supreme Court of Illinois after the filing of the *Garcia* opinion. In *People v. Brown* (1972), 52 Ill. 2d 94, 103, 285 N.E.2d 1, the supreme court held:

> "An act of intercourse clearly falls within the scope of the offense of committing indecent liberties with a child; and evidence of sexual intercourse is sufficient to satisfy a charge of lewd fondling and touching."

■■ This result seems to us to be pure common sense. Since the defendant inflicted the trauma and performed the act in question he must necessarily also have performed acts in the nature of fondling such as removal of the infant's "pants." As regards the requisite intent, reasoning from the premise that defendant performed the criminal act, as above shown, and considering the stipulation of the parties that the injury consisted of external and internal trauma to the vagina of the infant, this trauma must necessarily have been applied either by the defendant's sexual organ or with an instrumentality or weapon of some type. If the sexual organ was used, the element of the statutory intent of satisfying the sexual desires of the defendant is manifestly present. If any other type of instrumentality was used, we reach the same result in view of the fact that injuries were intentionally inflicted upon the vaginal area.

In our opinion, there has been proof beyond a reasonable doubt of the requisite act as well as of the criminal intent. The judgment of the trial court is accordingly affirmed.

Judgment affirmed.

McGLOON and BUCKLEY, JJ., concur.