(No. 45006.– )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EZELL RODGERS, Appellant.

*Opinion filed November 30, 1972.*

WARD, J., took no part.

GERALD W. GETTY, Public Defender, of Chicago (GEORGE L. LINCOLN and JAMES J. DOHERTY, Assistant Public Defenders, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and MARK T. ZUBOR, Assistant State's Attorneys, of counsel), for the People.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, Ezell Rodgers, was convicted of murder, attempted murder and armed robbery in a Cook County circuit court jury trial and was sentenced to concurrent penitentiary terms of from 75 to 100 years, 19 to 20 years and 20 to 40 years, respectively. The appellate court affirmed the convictions (*People v. Rodgers (1972), 3 Ill. App. 3d 85*), and we granted leave to appeal.

Defendant asserts that the pretrial photographic identification procedure was so impermissibly suggestive as to be a denial of due process, that the identification testimony was insufficient to establish guilt beyond a reasonable doubt, that evidence of the victim's injuries was irrelevant and inflammatory, that evidence of defendant's personal finances was irrelevant to motive and otherwise inadmissible, and that the trial court erred in refusing to allow the defendant to elicit from a police officer an alleged prior inconsistent description of the assailant given by the identifying witness.

Prosecution witness Willard Ingersoll testified that on November 7, 1965, he was employed as an attendant at Trucker's Paradise, a gas station, located at 1234 West Cermak Road, Chicago. At approximately 6:00 P.M. Ingersoll weighed a truck on the station's truck scale which is located directly in front of the station office. Truck driver Harry Ganzen, after driving his truck off the scale, went into the station house washroom. At this time the assailant, having driven his automobile, identified as a maroon 1963 Oldsmobile "98" sedan, up to the pump area some 100 feet from the station house, walked up to

Ingersoll, who was inside the station, and requested that his gas tank be filled, the oil checked and the windows wiped. As Ingersoll was servicing the car, Hugo Rodriguez, a fellow employee, drove up, walked over to Ingersoll and accompanied him back to the station house to show the location of the switch for the outdoor vapor lights. As they entered they saw the assailant sitting in a phone booth located inside and in the rear area of the station house. At this time the interior station lights and the pump lights were already on. Rodriguez then left the station and Ingersoll returned to servicing the assailant's auto, at which time he saw the assailant walking around the truck-parking area of the gas-station lot. Ingersoll was unable to locate the oil dipstick and walked up to the assailant, who was then standing in the station doorway drinking a soda, and asked for assistance. The assailant returned to the car with Ingersoll, pointed to the oil dipstick and then went back into the station house. Ingersoll finished servicing the auto, went into the station house and advised the assailant of the amount of the bill. The assailant, standing directly across the office counter from Ingersoll, stated it would be a charge, but when he gave the name, Ingersoll informed him that that party did not have a charge account. The assailant then pulled out a gun; Ingersoll raised his hands but was told to put them down and to walk to the rear toward the telephone booths where the washroom door was located. At that time Harry Ganzen, the truck driver, emerged from the washroom, saw the gun and grabbed the assailant's hand; as he did so the assailant raised the gun and pulled the trigger, mortally wounding Ganzen.

The assailant then ordered Ingersoll to go into the washroom and to place his hands up against the wall. Ingersoll waited one to two minutes, heard the assailant return to the washroom, heard a gunshot and had turned his head to the left when another shot was fired striking him between the eyes and exiting through his right temple

causing blindness in the right eye. Ingersoll stated that $190 was taken from the station, including $40 of his personal funds.

Shortly after Ingersoll's release from the hospital he and Rodriguez jointly described the assailant to the police as being a Negro, 6 feet in height, weighing 160 pounds, with black hair, brown eyes, light brown complexion, sunken cheeks with pock marks, one day's growth of beard, Caucasian features, *i.e.*, "his ears, they weren't flatly pressed down and he didn't have such a large nose and his lips, they weren't that thick", approximately 45 to 50 years of age, rather well dressed and wearing a hat. A composite sketch was later drawn.

Ingersoll further testified that during the following months he viewed approximately 2,000 police photographs, though never identifying any of them except to note that several exhibited facial characteristics similar to those of the assailant; that on December 28, 1967, he was shown a photograph of the defendant upon which a police artist had drawn a hat, and immediately identified the defendant as being the assailant. Ingersoll had not previously been shown a photograph of defendant. He also picked defendant in a five-man lineup held later that day and recognized defendant's voice, it being somewhat unusually high pitched. Ingersoll also identified defendant in court and indicated the total absence of doubt in his mind.

Hugo Rodriguez testified that during the time he was at the gas station assisting Ingersoll with the outdoor lights he saw a Negro male in a phone booth about 10 feet away and as he was preparing to leave he saw the same man standing on a "stoop" in the open archway of the rear room where the phone booths were located. He described the assailant as being between 45 and 50 years of age, approximately 160 pounds, about 6 feet 2 inches tall, well dressed, wearing a small hat, and having pock marks on his

face and something dark on his face in the cheek area. He also identified the car which Ingersoll was then servicing as a maroon 1963 Oldsmobile "98".

Rodriguez also testified to selecting defendant's photo from a group of eleven photographs shown to him by the police on January 8, 1968. At trial he stated that the assailant looked like defendant but he could not be positive.

Police detective William Thompson testified that in December of 1965 he was assigned to locate the car used in the crime; that he found a matching car which was registered to the defendant; that defendant was questioned about his car and employment and agreed to be photographed. This photograph, however, thereafter remained in Officer Thompson's personal file and was not shown to anyone until it was turned over to homicide detective Sandburg on January 8, 1968, and included in the photographs shown to Rodriguez.

Donald Tilton, collection manager of the automobile finance company which financed defendant's purchase of the car in question, testified that from the beginning, December, 1964, until November, 1965, none of defendant's monthly payments of $87.54 were made by the 10th of the month as required. In November, 1965, however, two past-due installments were paid by the defendant but no payment was made in December of 1965. Defendant's take-home pay was established as approximately $90 to $95 per week. The defendant did not testify nor was any evidence offered in his defense.

Defendant here argues that he was denied due process in that the showing to Ingersoll, some two years after the crime, of a single photograph of defendant upon which had been drawn a hat similar to the assailant's "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.*

Although the defendant did object to the identification testimony, the record indicates he did so only on the ground that he was not advised of his right to counsel at the pre-indictment lineup. That basis for objection has been eliminated, of course, by *Kirby v. Illinois (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877*, and *People v. Palmer (1969), 41 Ill.2d 571*, as construed by *People v. Williams (1972), 52 Ill.2d 455*, and *People v. Burbank (1972), 53 Ill.2d 261*. We conclude, therefore, that defendant's failure to object in the trial court to the "suggestiveness" of this procedure would, of itself, preclude consideration of the issue now raised. *People v. Studdard (1972), 51 Ill.2d 190, 197-198*.

Apart from the waiver issue, however, we believe defendant's contention ought not to be sustained. Although the photographic identification procedure now complained of is not to be commended, the factual circumstances disclosed by the record indicate, in our opinion that the witness's identification of defendant had an origin independent of the photographic identification proceedings and was uninfluenced thereby (*People v. Martin (1970) 47 Ill.2d 331, 337-338; People v. McMath (1970), 45 Ill.2d 33, 37*), for Ingersoll had an excellent opportunity to observe the defendant at the time of the crime. (*People v. Speck (1968), 41 Ill.2d 177*.) During the approximately 20 minutes that elapsed between the defendant's first entry into the station and the shooting of Ingersoll, the latter conversed with defendant face to face in good lighting on three separate occasions. Defendant also accompanied Ingersoll to the car to help locate the oil dipstick, and Ingersoll, of course, observed at close range as the defendant struggled with the truck driver. We note, too, that Ingersoll immediately identified defendant at the police lineup, and also recognized his voice, and was positive of his identification during cross-examination. *People v. Blumenshine (1969), 42 Ill.2d 508 514*.

Defendant points to a more than two-year lapse of

time before he was identified, the discrepancy between defendant's age (approximately 32 years of age at the time of the crime) and the witnesses' estimate thereof, Rodriguez's testimony that he had thought the assailant was a little taller and older than defendant and his failure to positively identify defendant in court, and the difference between certain of the defendant's features, namely nose and lips, and the composite police sketch as combining to raise a reasonable doubt of the defendant's guilt. We do not agree.

"We have often stated that positive identification by a single witness who has ample opportunity for observation is sufficient to support a conviction." (*People v. Clarke (1971), 50 Ill.2d 104, 110.*) The lapse of time goes only to the weight of the testimony, a question for the jury, and does not destroy the witness's credibility. Furthermore, the identification testimony was in part corroborated by the matching description of defendant's car with the car of the assailant.

Defendant next argues that the evidence of Ingersoll's injury was irrelevant and inflammatory. After explaining the location of the bullet wound, Ingersoll was asked if he had suffered any resulting impairment of his right eye. Over defendant's objection, he answered that he had no sight in the right eye. Without deciding the relevancy of that statement (*People v. Nickolopoulus (1962), 25 Ill.2d 451*), it is our opinion that it was not so highly inflammatory as to deny defendant a fair trial.

Defendant also contends that the admission of evidence of his personal finances was prejudicial error for it was allegedly irrelevant as to motive and inadmissible for any other purpose. We cannot agree. The pattern of late payments followed by payments in an amount almost equal to that taken in the robbery, which were made contemporaneously with the crime, is corroborating circumstantial evidence of defendant's guilt. "The test of admissibility of evidence is whether it fairly tends to prove

the particular offense charged and any circumstance may be put in evidence which tends to make the proposition at issue either more or less probable." (*People v. Nemke* (1970), 46 Ill.2d 49, 58.) We think this evidence meets that test.

Finally defendant argues that the trial court erred in refusing to allow defendant to elicit from a police officer called by the defense an alleged prior inconsistent description of the assailant given by the identifying witness and allegedly contained in the police report. In our opinion such testimony was properly excluded, inasmuch as it was an improper attempt to impeach the identifying witness by introducing a prior inconsistent statement without first laying the proper foundation. "[B]efore a witness may be impeached by his prior inconsistent statement he must be alerted concerning it in order to avoid unfair surprise and to give him an opportunity to explain." (*People v. Moses* (1957), 11 Ill.2d 84, 87.) Defense counsel had possession of the police report during his cross-examination of both Ingersoll and Rodriguez, and, despite full opportunity to do so, did not lay a foundation for possible impeachment. No questions were asked relating to prior inconsistent statements, no offers to prove such statements were made, nor is there in this record any indication that the police reports did, in fact, contain impeaching material in addition to that previously indicated herein.

Accordingly, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE WARD took no part in the consideration or decision of this case.