THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAWRENCE CHATMAN, Defendant-Appellant.

(No. 54536;

First District (4th Division)—September 24, 1975.

James J. Doherty, Public Defender, of Chicago (Frances Sowa and Donald S. Honchell, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Donald M. Devlin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

After a bench trial, Lawrence Chatman was convicted of murder and sentenced to 14 to 15 years in the penitentiary. Chatman's appeal was dismissed for want of prosecution and was ordered reinstated by the Illinois Supreme Court September 13, 1974. He raises three issues on appeal: (1) whether the defendant was proved guilty of murder beyond a reasonable doubt, where he is convicted solely upon identification evidence tainted as the result of a suggestive and prejudicial one-man show-up, or where the eyewitness did not have an adequate view of the assailant at the time of the offense upon which to base his identification of the defendant, and gave a description of the offender which in no way resembles the defendant; (2) whether the court erred in convicting the defendant of murder when the State failed to prove by either testimonial or documentary evidence that the alleged acts of the defendant caused

the death of the victim; and (3) whether the defendant was proved guilty of murder beyond a reasonable doubt where the trial judge referred to matters outside the record in finding the defendant guilty and indicated that he was uneasy in making his finding of guilt.

The State's first witness, Charles McCary, the half-brother of the deceased and a life-and-death witness, testified that Edwin Castine was alive and in good health prior to May 20, 1967, and was dead the next time McCary saw him.

The next witness, Johnny Hamblet, testified that on May 20, 1967, he left home and went to a pool hall on Garfield Boulevard in Chicago where he met Castine. Castine asked Hamblet to accompany him so the two men left the pool hall and walked down Garfield Boulevard to Prairie Avenue. They turned down Prairie, walked south to 55th Place, then turned and proceeded eastward on 55th Place. Just before they reached the "L" tracks, the witness testified that Castine told a man in front of them, "I'm not going all the way home with you," and crossed the street behind the man. When the two men reached the south side of 55th Place, the man in front of them who was identified by the witness as the defendant, turned around and the deceased told him, "Go on, pull your popgun," at which time the defendant reached into his jacket pocket, pulled a gun and shot Edwin Castine in the chest. Castine staggered across 55th Place and collapsed. As the defendant walked westbound on 55th Place, Hamblet viewed his profile from his vantage point on the north side of the street.

During cross-examination, Hamblet admitted that he was in custody. The State's Attorney stipulated to the fact that the witness was present under a body attachment issued by the court because of his failure to appear. The witness also admitted that he knew the case was pending and that he was wanted in court to testify.

The witness further testified on cross-examination that he first saw the defendant after he crossed the street, that he was never very close to the defendant, and that he only saw him for a "fleeting moment." Hamblet stated that he gave a description of the perpetrator of the crime to the officers who arrived on the scene. About a month later, Hamblet was taken to the police station where he identified the defendant who was in a cell talking to a policeman as he viewed him through a peephole.

Cornelius Martin, a police officer who was part of a followup investigating team, testified that he arrived on the scene, talked with other officers, and attempted to locate Johnny Hamblet. On May 21, 1967, Hamblet was found, questioned about the shooting, and a written statement was taken from him. After talking with Hamblet, the officer tried to discover the assailant's identity by contacting informers, and learned that the offend-

er's name was Lawrence Chatman. On June 15, 1967, at about 5:30 a.m., Officer Martin and other officers arrested the defendant in his apartment. Hamblet was then picked up and taken to the Wabash Avenue Police Station where he identified Chatman.

Lawrence Chatman, the only witness called by the defense, denied being in a poolroom on Garfield Boulevard, denied being near the "L" tracks on 55th Place, and denied knowing the deceased. Chatman also testified that at the time of the murder he was alone, working in his mother's house at 4550 King Drive. He stated that he arrived there at 12 p.m., that he never left during the afternoon, and that he departed at 6:30 p.m. In concluding, the defendant testified that he did not own a gun.

The defendant first contends that he was convicted solely upon identification evidence tainted as a result of a suggestive and prejudicial one-man showup. In this case, the showup took place when the police brought Hamblet to the station for the announced purpose of identifying a man in custody. The witness viewed the defendant through a peephole while he was incarcerated in a cell talking with an officer. It is argued that the custodial identification which occurred was so strongly suggestive and conducive to irreparable mistaken identification that the accused was denied due process of law. *Stovall v. Denno* (1967), 388 U.S. 293, 18 L.Ed.2d 1199, 87 S.Ct. 1967.

We think that the practice of conducting one-man custodial showups or lineups, at a police station or elsewhere, for the purpose of identification is a procedure that must be frowned upon. However, a claimed violation of due process rights in the conduct of a confrontation requires that the court review and scrutinize the surrounding circumstances. In *People v. Blumenshine* (1969), 42 Ill.2d 508, 512, 250 N.E.2d 152, our Supreme Court recognized that a showing by police of a suspect in a one-man lineup carries with it a dangerous degree of improper suggestion. However, *Blumenshine* states that not every viewing of a suspect alone will be considered a denial of due process, and specifically delineates the following justifying or saving circumstances:

"* * * (1) *Stovall v. Denno*, 388 U.S. 293, 18 L.Ed.2d 1199, where the viewing in a hospital was 'imperative,' it being uncertain that the wounded victim would survive; (2) *People v. Speck*, 41 Ill.2d 177, 193, where a principal factor was that it was apparent that the identifying witness had an excellent opportunity to observe the defendant at the time of the crimes; (3) *People v. Robinson, ante,* at 371, where the person identified was known to the witness prior to the crime; (4) *People v. Bey, ante,* at 139, where uncommon distingushing [*sic*] characteristics were the principal means of identification." 42 Ill.2d 508, 512.

██ We have reviewed the record and concluded that the in-court identification of the witness had an independent origin from the custodial showup conducted at the police station. In this case the witness had an opportunity to view the defendant since the shooting occurred on a city street, in the early afternoon, while the sun was shining. The defendant had been walking 10 or 12 feet ahead of the witness and the deceased, and then turned and faced the victim and the witness after he crossed the street. These attendant circumstances provided the witness, who was present at the time of the crime, with an opportunity for a definite identification. Therefore, we hold that the witness' in-court identification was independent of and untainted by the pretrial custodial jailhouse showup. See *People v. Taylor* (1972), 52 Ill.2d 293, 287 N.E.2d 673.

The defendant also contends that the discrepancies in age, height, and weight between the description of the perpetrator and that of the defendant totally eliminates the persuasive value of the State's witness' testimony. The witness told the police that the offender was 30 to 40 years of age, weighed 150 to 155 pounds, and was a short man. Defendant argues that the description is contradictory in every respect since the record shows that the defendant was 25 years old at the time of the shooting, that his height was 5 feet 10½ inches, and that he weighed approximately 220 pounds.

In *People v. Calhoun* (1971), 132 Ill.App.2d 665, 668, 270 N.E.2d 450, this court was confronted with a similar problem because of slight variations in the height and weight description given to police and the actual description of the accused. The court held that discrepancies in the description do not destroy the credibility of eyewitness identification but only affect the weight to be given to that testimony. The court found the discrepancies of 6 inches in height and 20 or 30 pounds in weight did not destroy the credibility of the identification.

Defendant also questions the fact that 1 month elapsed between the shooting and the showup. The amount of time intervening between the incident and the identification is another factor to be considered. However, identifications have been upheld where more than 1 month has elapsed. (*People v. Bennett* (1973), 9 Ill.App.3d 1021, 1026, 293 N.E.2d 687.) Finally, in the instant case, the defendant complains about the quickness of incident and the inability of the witness to view the assailant. When a similar argument was made, *Bennett* found a few seconds to be sufficient since the identification was positive.

██ When there is a positive identification by a single witness that is credible, as we have in the instant case, it is sufficient to support a verdict of guilty. (*People v. Moore* (1969), 42 Ill.2d 73, 246 N.E.2d 299; *People*

*v. Calhoun* (1971), 132 Ill.App.2d 665, 270 N.E.2d 450.) The identification in the case at bar was positive and we see no reason to question it. Moreover, we do not believe that the witness' inability to describe the facial characteristics of the accused makes his testimony suspect since precise accuracy in describing facial features is unnecessary where, as here, the witness is certain about the identification. *People v. Del Genio* (1973), 10 Ill.App.3d 437, 443, 294 N.E.2d 78.

Here, the trial judge, the finder of fact, determined the credibility of the witnesses and weighed the evidence, and the finding of guilt will be disturbed only where the evidence presented in support of defendant's conviction was so unreasonable, improbable, and unsatisfactory as to leave a reasonable doubt as to defendant's guilt. (*People v. Catlett* (1971), 48 Ill.2d 56, 64, 268 N.E.2d 378.) After carefully reviewing the record, we see no reason why the trial court's finding of guilt should be overturned.

■■ The defendant's second contention is that the trial court erred in convicting him by failing to prove either by testimonial or documentary evidence that the alleged acts of the defendant caused the death of the deceased. He submits that the criminal agency of the offender was not shown to have caused the death of the victim since no medical evidence, documentary or testimonial, was ever introduced. We disagree with this contention. Early in the trial the State and defense counsel stipulated to the cause of death:

> "MR. DARRAGH [Assistant State's Attorney]: Sir, will you stipulate as to the cause of death of the decedent?
>
> MR. EVINS [Defense counsel]: The cause of death?
>
> MR. DARRAGH: Yes.
>
> MR. EVINS: Yes."

Then, at the close of the State's case, the following colloquy took place:

> "MR. DARRAGH: Your Honor, at this time the State will rest its case in chief.
>
> MR. BRONNER [Assistant State's Attorney]: Your Honor, we have rested our case, but there was a stipulation prior to any testimony that was taken that the Coroner's Protocol would be admitted into evidence as stipulated to. We haven't offered it. At this time I think we should do that.
>
> THE COURT: Very well. Let me see the Protocol and I will read it into the record.
>
> MR. BRONNER: What is the age of the defendant, counsel?
>
> MR. DARRAGH: Could we have that marked as People's Exhibit No. 1 for identification?

> THE COURT: All right, 1 and 1-A, and by agreement it can be introduced in evidence and it will be admitted, and the Court will read it.
>
> (Whereupon, People's Exhibits Nos. 1 and 1-A were marked for identification.)
>
> MR. DARRAGH: All right.
>
> THE COURT: This has been identified, Miss Reporter. You can mark them in evidence later."

We feel the record indicates that the trial court admitted the protocol into evidence by instructing the court reporter to mark the protocol as People's Exhibits Nos. 1 and 1-A for identification, and it was at that point admitted in evidence. We hold that the protocol was properly admitted into evidence. It contained facts which established the cause of death. The protocol, when coupled with testimonial evidence, established the criminal agency of the defendant.

■■ Finally, it is contended that the trial court's finding of guilt was based on evidence outside the record. The appellant, relying on *People v. Rivers* (1951), 410 Ill. 410, 102 N.E.2d 303, argues that a defendant has a right to rely on his constitutional guarantee that nothing shall be considered against him except the competent evidence introduced in open court. It is further argued that defendant's rights were prejudiced when the court referred to proceedings held long before the date of trial, namely, the coroner's inquest, the preliminary hearing before Judge Ryan, and the grand jury proceedings. Defendant's conclusions are based on the following statement made by the trial judge when he entered his findings:

> "THE COURT: Well, Mr. Evins, you have had the Coroner's inquest. Of course it's not too much of a legal setup, held the man for murder. Judge Ryan held him for murder after hearing the evidence, and the defendant was before the Grand Jury, and they indicted him for murder and set bail; and I don't see how I can ignore the positive evidence that has been presented to me. If I'm wrong you will have to let the Appellate Court decide it, but I can't. I would be the last one in the world to want to see a man go to the penitentiary for a murder he didn't commit; but I can't shut my eyes to the evidence that has been produced before me; and I don't have any other alternative."

We think that the defendant has misinterpreted the trial court's remarks since the court's reference to the coroner's inquest, the preliminary hearing, and the grand jury proceedings were nothing more than a recitation of the history of the case. We hold that the trial judge's finding of guilt was based on the evidence because of the following statements: (1)

"* * * I don't see how I can ignore the positive evidence presented to me," and (2) "* * * I can't shut my eyes to the evidence that has been produced before me; * * *." We do not think that these statements indicate that the trial judge was doubtful or uncertain about the evidence but was only showing compassion and concern for the accused. Therefore, we hold that defendant's conviction was based on the competent evidence before the court.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BURMAN and ADESKO, JJ., concur.