THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BILLY WARDELL *et al.*, Defendants-Appellants.

First District (3rd Division) Nos. 1—88—1913, 1—88—1925 cons.

Opinion filed June 10, 1992.

TULLY, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Richard E. Gade, Assistant Public Defender, of counsel), for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Howard D. Weisman, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

Following a joint jury trial, defendants, Billy Wardell and Donald Reynolds, were convicted of aggravated criminal sexual assault, armed robbery, attempted aggravated criminal sexual assault and attempted armed robbery. Wardell received triple consecutive terms of imprisonment totaling 69 years. Reynolds received consecutive and extended terms of imprisonment totaling 69 years. Both defendants now appeal.

On appeal, Wardell asserts that one victim's identification of him was not sufficiently reliable so as to convict him beyond a reasonable doubt. Reynolds contends that the trial court erred by precluding certain DNA testing which he alone requested.

Both Wardell and Reynolds claim that the trial judge's remark made at sentencing and regarding the cross-racial nature of the crime entitle them to a new sentencing hearing and that the sentences imposed were an abuse of discretion.

We affirm Wardell's conviction beyond a reasonable doubt and the trial court's decision to refuse to order the DNA tests requested by Reynolds. We remand for a new sentencing hearing based on the trial judge's explicitly racial comment at sentencing.

The events underlying defendants' convictions occurred on the evening of May 3, 1986, and involved two female victims, J.C. and C.H. About 10:15 p.m., while walking near their college dormitory, the two victims were approached from behind by three male assailants. The three men shoved the victims to their knees, demanded their money, and told them that they had a gun. C.H. saw a gun but had no money. J.C. gave her money ($6) to one of the assailants later identified as defend-

ant Donald Reynolds. The assailants then told the victims to get up and walk straight ahead.

A short distance later, the three men ran up behind the victims again, told them to get down on their hands and knees and crawl. The victims crawled in several directions. The assailants then told the victims to get up and forced them to walk several blocks until they reached an empty lot enclosed by a fence and described as a garbage dump. J.C. was then led away and separated from C.H.

J.C. testified that she was raped by Reynolds three times and by an unknown male once. During the struggle, Reynolds hit J.C. in her face with a metal object and choked her. J.C. scratched Reynolds on the face and neck.

C.H. testified that when she was separated from J.C., all three assailants told her to take off her clothes, she screamed and was hit from behind on the side of her head. Wardell and Reynolds then left her with the unknown third male who put his hand over her mouth. C.H. heard J.C. screaming, choking and gagging. When Wardell later reappeared, the unknown male left. Wardell told C.H. to take her clothes off and she screamed. Wardell ripped C.H.'s clothes, threw her to the ground, and started choking her. C.H. dug her nails into his penis and Wardell punched her in the right eye. When C.H. tried to get up, Wardell knocked her down by hitting her with something very hard on the left side of her face.

The victims then climbed over the fence, crossed an empty lot, and called for help on a university security phone.

Thereafter, university security and Chicago police officers arrived. The victims gave statements to the police and were taken to the hospital to be treated. C.H. gave the police a description of the assailants' ages, height, weight and clothing.

On May 6, 1986, police officers picked up C.H. and J.C. to bring them to the police station to prepare a composite sketch of their assailants. While riding to the station, the squad car passed another detective who was talking to Reynolds. The detective had stopped Reynolds because he fit one assailant's general description which had previously been given by the victims. Reynolds had scratches on his face, neck and chest. As the squad car passed by Reynolds, J.C. said "that's him" and "that's the guy," referring to Reynolds. The police officer stopped the car and brought Reynolds over to the car. Both victims then identified Reynolds as one of their three assailants and he was arrested.

On May 8, 1986, C.H. and J.C. individually viewed a lineup but were unable to identify the other two assailants.

On June 6, 1986, both victims separately viewed photographs of six different men provided by the police. C.H. picked out a photo of Wardell and said "this could be one of the guys" but was not certain because the man in the photo had long hair and she only saw her attacker while he was wearing a hood from his sweatshirt.

On June 10, 1986, both victims separately viewed another lineup of five men. Each participant put on a gray sweatshirt with the hood pulled up and said the phrase "[A]re you trying to play dead?" which was spoken during the attack. J.C. could not make a positive identification. C.H. identified Wardell and said "that is the man, yes, that is the man." At trial, C.H. also identified Wardell in court.

In January 1988, before trial, Reynolds moved to have a DNA fingerprinting test performed on semen or blood samples taken from J.C. and Reynolds. In his motion, Reynolds noted that DNA testing was not available until October 1987 and attached affidavits of two doctors who worked for Cellmark Diagnostics, the company which would administer the tests.

On February 17, 1988, following a hearing, the trial court refused to allow the DNA test, reasoning that the test did not meet "the necessary legal requirements of the law." The trial judge stated "I do not believe that there is enough information available to either substantiate the validity of this test and the probative value of this test. *** [A]s it stands right now I believe it is still in its embryonic stage."

The jury found Wardell and Reynolds guilty of the aggravated criminal sexual assault of J.C., the attempted aggravated criminal sexual assault of C.H., the armed robbery of J.C., and the attempted armed robbery of C.H.

Before pronouncing sentence, the trial judge noted the armed robbery of J.C. and the attempted armed robbery of C.H. The trial judge then stated: "You weren't satisfied with that. You were going to have some more fun with some white girls."

The trial judge then sentenced Wardell to three consecutive terms of imprisonment totaling 69 years and sentenced Reynolds to two consecutive prison terms, including an extended term for the aggravated criminal sexual assault of J.C., totaling 69 years.

Wardell raises the first issue on appeal and contends that the identification by C.H. was unreliable so as to preclude his conviction beyond a reasonable doubt. He argues that: (1) C.H.'s only opportunity to see her assailant was during a violent struggle; (2) her attention was directed toward the struggle, not the man's features; (3) the accuracy and certainty of her description during the photographic display on June 6 is questionable since she only stated "this could be the one" and did not

positively identify Wardell at that time; (4) the photographic display took place more than a month after the crimes; and (5) she never noticed Wardell's missing front tooth. We disagree and find that C.H.'s identification was sufficiently reliable.

■ Where the witness viewed the accused under circumstances permitting a positive identification, a single witness' identification of the accused is sufficient to sustain a conviction. (*People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317.) The following five circumstances are considered in evaluating an identification: (1) the opportunity the victim had to view the accused at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the accused; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Slim*, 127 Ill. 2d at 307-08.

■ We find that all five elements enunciated in *Slim* have been satisfied in the present case to establish a reliable identification of Wardell as one of the assailants. First, C.H. clearly had ample opportunity to view Wardell at the time of the crimes because his face was not masked in any way and she saw him face to face, in very close proximity, and over a considerable length of time. Second, C.H.'s degree of attention during the commission of the crimes is exemplified by her ability to describe her attackers' ages, height, weight and clothing to the police after they arrived on the scene, and her recognition of Wardell's voice in the lineup. Third, the accuracy of C.H.'s description during the June 6 photographic display is strengthened, not weakened, by her provisional selection of Wardell's photo since she had previously only seen him while he was wearing a sweatshirt hood. Fourth, defendant's assertion that C.H. lacked certainty as to the identification of Wardell at the June 6 photographic display totally ignores C.H.'s selection of his photo from the array, her nonselection of any suspects during prior opportunities such as a lineup on May 8, and her positive identification of Wardell at the June 10 lineup and in court. Lastly, the passage of about one month between the time of the crimes and the date of the photo identification did not adversely affect the identification. *People v. Rodgers* (1972), 53 Ill. 2d 207, 214, 290 N.E.2d 251 (identification two years after the crime was upheld); *People v. Smith* (1991), 215 Ill. App. 3d 1029, 576 N.E.2d 186 (two-year lapse); *People v. Chatman* (1975), 32 Ill. App. 3d 506, 510, 336 N.E.2d 153 (one-month lapse).

In addition, we also find that the failure of C.H. to notice that Wardell had a missing front tooth did not render her identification insufficient to establish beyond a reasonable doubt that Wardell was one of the assailants. Minor discrepancies and omissions in a victim's description of

her attacker, as to such matters as whether the assailant had missing teeth, does not generate a reasonable doubt where a positive identification has been made. *Slim*, 127 Ill. 2d at 309-10; *People v. Bias* (1985), 131 Ill. App. 3d 98, 104-05, 475 N.E.2d 253.

Wardell also argues that the State did not meet its burden of proof beyond a reasonable doubt because there was no physical evidence linking him to the crimes and three witnesses presented an alibi for him. We disagree.

The Illinois Supreme Court abolished the sex-offense standard of review which provided that a victim's testimony be clear and convincing or substantially corroborated. (*People v. Schott* (1991), 145 Ill. 2d 188, 582 N.E.2d 690.) In place of this standard, the supreme court found that the reasonable doubt test articulated in *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, should govern an appellant's claim of evidentiary insufficiency in sex-offense cases. *Schott*, 145 Ill. 2d at 202.

Accordingly, criminal convictions are not to be overturned on review where, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Schott*, 145 Ill. 2d at 203, citing *Collins*, 106 Ill. 2d at 261.

Whether alibi evidence creates a reasonable doubt of guilt is a question primarily for the trial court. (*People v. Berland* (1978), 74 Ill. 2d 286, 307, 385 N.E.2d 649.) The finder of fact determines the credibility of witnesses, weighs evidence and draws reasonable inferences therefrom, and resolves any conflicts in the evidence. *Slim*, 127 Ill. 2d at 307.

Even when contradicting alibi testimony is present, a single witness' positive identification is still sufficient to support a conviction. *Slim*, 127 Ill. 2d at 307.

■ In light of the evidence presented and the applicable standard of review, we find that a rational trier of fact could have found Wardell guilty of the crimes beyond a reasonable doubt.

Next, Reynolds asserts that he was denied his constitutional right to present a defense because the trial court refused to allow DNA fingerprint tests to be performed on specimens recovered from J.C. and himself. Reynolds argues that the DNA fingerprint tests could have excluded him as a possible semen donor and that the trial judge declined to delay the trial to accommodate the testing because he was being criticized by the crime commission for delay in bringing cases to trial.

In response the State contends that the trial court did not abuse its discretion in denying the DNA testing because Reynolds failed to meet his burden of proof that at the time of his trial, the scientific community accepted the DNA testing as reliable.

■ Initially we note that the trial court's decision, not its reasoning, is considered on review. (*E.g., People v. Eyler* (1989), 133 Ill. 2d 173, 213, 549 N.E.2d 268.) We believe that the trial court did not abuse its discretion in precluding the DNA tests.

The use of evidence obtained from a new scientific technique is governed by the standard established in *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013. The Illinois Supreme Court has recognized the *Frye* standard for evaluating the admissibility of new scientific techniques. *E.g., People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070.

The *Frye* standard prohibits the use of scientific evidence unless the technique has gained acceptance within the relevant scientific community. *People v. Thomas* (1990), 137 Ill. 2d 500, 517, 561 N.E.2d 57 (the process of "electrophoresis" to test dried blood satisfied the *Frye* standard); *Eyler*, 133 Ill. 2d at 207, 213 (allowed the use of a "supergluing process" to identify fingerprints and the use of "electrophoresis").

The determination of whether or not the *Frye* standard has been met is placed within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Lipscomb* (1991), 215 Ill. App. 3d 413, 430, 574 N.E.2d 1345.

Illinois cases have recently held that the DNA identification or fingerprinting procedure is generally accepted within particular scientific fields and is admissible. *People v. Miles* (1991), 217 Ill. App. 3d 393, 405, 577 N.E.2d 477; *Lipscomb*, 215 Ill. App. 3d at 432.

However, DNA testing, as acknowledged by Reynolds, only became available in the United States in October 1987. Thus, in February 1988 when the trial court ruled on Reynolds' motion, the DNA fingerprinting test had neither reached the degree of acceptability recognized now in 1992 nor had any Illinois court ruled on this issue.

In support of his motion, Reynolds submitted two affidavits from employees of Cellmark (Drs. Strom and Herrin) and one affidavit from another forensic science expert (Dr. Garner). He advised the court that DNA tests had been allowed in two Florida cases and in England.

The *Lipscomb* and *Miles* cases indicate the prior hesitancy in accepting DNA testing. In *Lipscomb*, one expert testified that he had previously refused to support Lifecodes Corporation, the company performing the DNA tests in that case, because of his concern over its procedures. *Lipscomb*, 215 Ill. App. 3d at 421.

In *Miles* the court noted that numerous cases decided before 1991 found Cellmark's testing procedures so unreliable that the results were not admitted into evidence. (*Miles*, 217 Ill. App. 3d at 403.) These remarks question whether Cellmark was producing reliable results in early 1988 when the trial court denied Reynolds' motion in the present case.

Given the early stage of development of DNA testing in 1988 and the paucity of information presented in the instant case as compared to the *Lipscomb* and *Miles* cases,[1] we cannot say that the trial court abused its discretion in deciding that the DNA testing methodology had not yet been generally recognized in the scientific community in early 1988.[2]

Next, both defendants, Wardell and Reynolds, assert that at sentencing, the trial judge's remark about the race of the victims shows that he considered an improper factor and thus tainted the sentencing determination. We agree.

---

[1] In *Lipscomb*, the proponent of the DNA testing (the State) presented the testimony of one expert witness who was employed by Lifecodes Corporation, the company performing the DNA tests in that case; the testimony of two experts who were not affiliated with Lifecodes; a detailed explanation of each step in the six-part procedure; an opportunity for the court to visually observe a part of the process; the actual comparison of the defendant's blood sample with the forensic sample; the statistical probabilities of the results reached; and evidence establishing that at least two companies (Lifecodes and Cellmark) and the FBI were then performing forensic DNA analysis. In the subsequent case of *Miles*, the opponent of the test (defendant) did not claim that DNA testing fails to meet the *Frye* standard, but contended the proponent of the test (the State) failed to present sufficient evidence to establish that the techniques used by Cellmark produced a reliable result. The *Miles* court found that "Cellmark, however, appears to be learning from past mistakes" and elaborated on the evidence showing the integrity of the process, and the quality control and assurance procedures instituted after numerous courts had refused to admit its results into evidence because its procedures were found to be so unreliable. *Miles*, 217 Ill. App. 3d at 403.

[2] The admissibility and reliability of DNA testing continues today to be the subject of debate. In a recent article in the American Bar Association Journal, the author observed that at least four different tests are employed by various jurisdictions to decide whether or not to admit DNA evidence: (1) the "pure *Frye*" standard, as used in Illinois; (2) the "*Frye*-plus" decisions, which add to the *Frye* test a requirement that the testing laboratory in the particular case perform the accepted scientific techniques in its procedures; (3) the basic relevancy standard of the Federal Rules of Evidence in place of the *Frye* test; and (4) the "relevancy-plus" cases which graft the *Frye* test and other inquiries onto a relevancy standard. The article also notes the rapid development and improvement of DNA testing procedures within the last year. (Goldberg, *A New Day for DNA?*, A.B.A.J., April 1992, at 84-85.) In addition, a recent Federal report, prepared by a panel of scientific and legal experts, stated that DNA fingerprinting techniques are not infallible and recommended the use of stricter standards to ensure the tests are performed and interpreted properly. National Research Council, *DNA Technology In Forensic Science* (1992); Rensberger, *Scientists Back DNA Tests, but Urge More Safeguards*, Chicago Sun-Times, April 15, 1992, at 26, col. 1; Kolata, *Federal Panel Urges Ban on Use of DNA "Fingerprinting" in Court*, Chicago Law Bulletin, April 14, 1992, at 3, col. 2.

After discussing the robbery offenses at the sentencing hearing, the trial judge commented that defendants then decided "to have some more fun with some white girls." This remark clearly referred to the subsequent sex offenses involving the defendants who are black and the victims who are white.

The State contends that the trial court merely parroted the words used by defendants during the attack and that no rights were violated. The State points out that C.H. testified one of her attackers told her "you white girls don't know what is good for you." Similarly, J.C. testified that after Reynolds raped her for the third time, he said "something about the fact that I was white and he was black."

Alternatively, the State maintains that the defendants waived this issue by failing to object to the trial judge's remark at sentencing and failing to address the issue in the post-trial motions.

To preserve an issue for review, a proper objection at trial and in a written post-trial motion are essential. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Brown* (1990), 200 Ill. App. 3d 566, 558 N.E.2d 309.

The waiver rule, however, is less rigidly applied when the the basis for the objection is the trial judge's conduct. (*People v. Nevitt* (1990), 135 Ill. 2d 423, 455, 553 N.E.2d 368; *Brown*, 200 Ill. App. 3d at 575.) The rationale for the relaxation of the waiver rule when the conduct of the judge is at issue stems from " 'the fundamental importance of a fair trial and the practical difficulties involved in objecting to the conduct of the trial judge.' " *Brown*, 200 Ill. App. 3d at 575, quoting *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936, 449 N.E.2d 568.

██ We find the exception to the waiver rule applicable here and, thus, will address the merits.

The Unified Code of Corrections mandates the criteria to be considered by a judge in imposing sentence upon the defendants. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—4—1.) The defendant is entitled to a new sentencing hearing where the sentencing judge relies on an improper factor (*People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168 (the judge personally maintained an "inflexible policy" of treating certain crimes as "simply not probationable") or where comments made by the sentencing judge indicate that he did not consider the requisite statutory factors (*People v. Rosa* (1990), 206 Ill. App. 3d 1074, 565 N.E.2d 221 (the judge referred to "the stupidity and slutliness of women," the "coward[ice]" of street gang members, and described the defendant as "slovenly" and "stupid"); *People v. Clemons* (1988), 175 Ill. App. 3d 7, 13, 529 N.E.2d 577 (the judge improperly invoked a "personal policy" of not disturbing a sentence without the approval of the victim involved);

*People v. Rafac* (1977), 51 Ill. App. 3d 1, 4-5, 364 N.E.2d 991 (the judge opined that "the defendants have taken the trial of this cause more of a joke than as a reality")).

The sentencing judge "owes the same duty to the defendant to protect his own mind from the possible prejudicial effect of incompetent evidence that he would owe in protecting a jury from the same contaminating influence." *People v. Riley* (1941), 376 Ill. 364, 369, 33 N.E.2d 872; see also *People v. Crews* (1967), 38 Ill. 2d 331, 337, 231 N.E.2d 451, *appeal after remand* (1969), 42 Ill. 2d 60, 63, 244 N.E.2d 593.

As the judge at trial must shield the jury from considering racially prejudicial remarks by the participants during trial, so also must the judge at sentencing safeguard against racial considerations. Rape incites, as it should, a feeling of outrage, but the offensiveness of that act is not transformed by the different skin colors of those persons involved. "[A]ppeals to racial prejudice, whether open or oblique, discredit our justice and are to be condemned." *People v. Dukett* (1974), 56 Ill. 2d 432, 443, 308 N.E.2d 590.

We must assume that defendants' race was considered by the judge when he imposed these long, consecutive sentences. If it is on his tongue, it most assuredly must be on his mind.

Due to the trial judge's improper consideration of the cross-racial nature of the crimes, we vacate defendants' sentences and remand the cause for a new sentencing hearing.

Lastly, since we have remanded for a new sentencing hearing, we need not address the propriety of the sentences imposed upon defendants.

For all the reasons stated above, we affirm the convictions of defendants and remand this cause to the trial court for resentencing.

Affirmed in part; vacated in part and remanded.

CERDA, J., concurs.

JUSTICE TULLY, dissenting:

I cannot agree with the majority view that the comments of the trial judge in this case require the sentences to be vacated. The testimony of both victims clearly indicates that race was at least a partial motive in the violent robbery and sexual assault of two young college students. During the assault, one of the assailants stated: "You white girls don't know what's good for you." After Reynolds penetrated one of the victims for the third time, he said something about himself being black and her being white. The majority finds that the trial judge improperly com-

mented upon the possible racial motivation behind the crime and that it was improperly considered in sentencing. I disagree.

In this instance, the statement of the trial judge was not an attempt to inject his own private prejudice into the judicial process, but rather was a comment on the evidence presented at trial. Where testimony regarding racial motivation is properly admitted into evidence without objection, and does not rise to the level of plain error, a new trial is not warranted. (See *People v. Eddmonds* (1984), 101 Ill. 2d 44, 461 N.E.2d 347.) Although the judge would have been wise to "hold his tongue," it was not unduly prejudicial for the judge to consider racial motivation, given the explicit testimony of the victims in this case. Even if improper, the comment was not so egregious as to warrant a new sentencing hearing.

Secondly, the actual sentences of the defendants, when compared with the maximum sentences allowed by statute, do not reflect any apparent taint or prejudice by the trial judge. The maximum consecutive sentence permitted would have been the sum of the maximum terms for the two most serious felonies under section 5—8—2 of the Unified Code of Corrections. (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—2, 1005—8—4.) Under section 1005—8—2, dealing with extended terms, the maximum consecutive sentence for either defendant would be 120 years. Both defendants received 69 years, which is considerably less than the maximum.

For all of the foregoing reasons, I respectfully dissent from the majority opinion.