2020 IL App (1st) 163295-U

No. 1-16-3295

Order filed March 17, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 3179 |
| | ) | |
| MARCO PENALOZA, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's 12-year sentence for aggravated discharge of a firearm is affirmed where the trial court did not consider an improper factor at sentencing.

¶ 2    Following a bench trial, defendant Marco Penaloza was found guilty of aggravated discharge of a firearm under a theory of accountability and sentenced to 12 years' imprisonment. On appeal, defendant argues that at sentencing, the trial court improperly imputed a race-based motivation for the offense. For the following reasons, we affirm.

¶ 3    Defendant, Rogelio Marin, and defendant's brothers, Diego Penaloza and Jose Penaloza[1] were charged with multiple offenses arising from an incident on January 9, 2013, in Chicago, Illinois. Defendant was charged with several counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1), (b)(1) (West 2012)), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(3), (4) (West 2012)), and aggravated fleeing and eluding (Pub. Act 97-743, § 5 (eff. Jan. 1, 2013) (amending 625 ILCS 5/11-204.1(a)(1), (3)). Defendant's bench trial ran simultaneously with Diego's separate bench trial and Jose's jury trial.[2]

¶ 4    Sterling Edwards (Edwards) testified that on January 9, 2013, he and his uncle[3] were heading west on Belden Avenue, when a "tan gold-ish" SUV with "four Hispanic male[]" occupants passed his vehicle going east. The front passenger and the two men in the back of the SUV made "hand gestures" at Edwards, which he identified as gang signs. Edwards denied having ever been in a gang and did not recognize the signs; however, the parties stipulated that "[i]f called to testify, Detective Haloran . . . would testify that when he ran Sterling Edwards' name in the CPD database, it came back as affiliated with the Four Corner Hustlers gang."

¶ 5    As Edwards made a left turn onto Long Avenue, the SUV stopped, and Edwards saw two of the men jump out of the car through his rearview mirror. Edwards testified that one of the men came from the back of the car and a man with braids "came from around the side of the driver," but Edwards did not know whether that man was the driver. The men were approximately 15 to 20 feet behind Edwards' car. Edwards testified that the man who came from the back of the car

---

[1] Because Diego and Jose share a last name, we refer to them by their first names.
[2] Marin pled guilty to unlawful use of a weapon by a felon.
[3] Edwards subsequently testified that the passenger in his car was not actually his uncle; he was a close family friend

"had a white shirt on, a white T-shirt. He had a black object in his hands. I assumed that it was a weapon." At trial, Edwards identified the man with the weapon as Diego and the man with the braids as Marco. As Edwards tried to speed away, Diego began jogging toward Edwards' vehicle, with Marco a few feet behind him. Diego and Marco got back in the SUV and sped after him.

¶ 6 After chasing Edwards for approximately 10 to 15 minutes, the SUV hit another car at North Avenue and Laramie and drove off down Laramie. At trial, Edwards testified that he saw one of the occupants of the SUV flash a gun immediately before the collision. Edwards kept driving and saw police vehicles nearby. Once he saw that defendants were being arrested, Edwards pulled over and identified Marco and Diego as the men who had been in the SUV chasing him.

¶ 7 Edwards acknowledged that he had previously been convicted of aggravated driving under the influence, aggravated fleeing and eluding, and had three separate convictions for possession and delivery of a controlled substance. On cross-examination, Edwards admitted that he did not mention that he saw the gun a second time during his grand jury testimony but asserted that he was not specifically asked how many times he saw the gun that night. The parties stipulated that Detective Zacharias interviewed Edwards the day after the shooting and, according to his supplementary report, Edwards never mentioned having seen a gun for a second time prior to the SUV's collision.

¶ 8 Jose Santiago testified that on January 9, 2013, around 9 p.m., he was turning into the intersection at North and Laramie with his two children in the backseat when his black vehicle was struck by a gold SUV running a red light. The SUV failed to stop and continued speeding down Laramie followed by an unmarked police vehicle.

¶ 9    Officer Richard Yi testified that on January 9, 2013, around 9:30 p.m., he and Officer Panos Theodorides were on patrol near North and Laramie when they observed a midsize SUV collide with a smaller black vehicle and continue driving. The officers followed the SUV as it turned onto Hirsch Street, at which point Yi observed a "male Hispanic on the front passenger side stick his head out . . . look in [their] direction . . . [place] his right hand out with a large firearm and take one shot at [them]." Officer Yi immediately called in "shots fired at the police" to the dispatcher. The SUV kept fleeing "turning northbound on Leamington . . . hopping the curb and ended up driving on the sidewalk next to [a] school." The vehicle continued northbound to the end of the block where it was stopped by another police vehicle between Hirsch and Le Moyne. The occupants of the SUV were immediately taken into custody." Officer Yi positively identified defendant as the driver of the SUV.

¶ 10    After the State rested, the trial court granted the defense motion for a directed finding as to the charges of attempt first degree murder and aggravated fleeing and eluding. Following the court's ruling and the admission of two stipulations, the defense rested without presenting any additional evidence. The court found defendant guilty of aggravated discharge of a firearm.

¶ 11    Defendant filed a motion for a new trial, arguing he was "merely present" during the shooting and was not legally accountable for the offense, which the court denied. The court conducted a joint sentencing hearing for defendant, Diego, and Jose. The State argued in aggravation that on the night of the shooting, defendant and the other offenders spent the evening driving around terrorizing people in the neighborhood, chased Edwards and his uncle, crashed into Santiago's vehicle, and shot at police officers. Noting that Jose and Diego's presentence investigation reports indicated past affiliation with the Latin Stylers street gang, the State argued

that Marco's denial of gang affiliation "should be looked on with suspicion." In mitigation, defense counsel argued that defendant's participation in the offense was limited to "driving his brothers around that night." He had no criminal background, was employed, lived with his girlfriend and son prior to his arrest, and spent his time in jail finishing high school and participating in a bible study group.

¶ 12    In addition to considering "[t]he evidence *** at the trial for each of these individuals, the presentence investigation . . . the evidence offered in aggravation, mitigation, the statutory factors in aggravation and mitigation, and the financial impact of incarceration," the court also indicated, as follows:

> "In particular, I'm troubled by the confronting of these two African-American individuals on the northwest side of the City of Chicago, which was predicated, in this Court's view, on the presumption that because of their ethnicity, that they were somehow affiliated with a gang themselves. I think one of the statements alluded to that.
>
> In any event, the crime in its entirety evidences a real disregard for the safety of their fellow citizens in the City of Chicago. And this is, in every sense of the word, an onerous offense."

¶ 13    The court sentenced defendant to 12 years' imprisonment. Defendant filed a motion to reconsider sentence, arguing the sentence it was excessive "in view of [his] background and the nature of his participation in the offense," which the trial court denied.

¶ 14    On appeal, defendant argues the trial court improperly imputed a race-based motivation for the offense while sentencing him.

¶ 15    "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Although conceding failure to preserve his claim, defendant argues that the forfeiture rule should be relaxed in this case, because the trial judge's conduct is of issue. See *People v. Sprinkle*, 27 Ill. 2d 398, 401 (1963) ("a less rigid application of the rule requiring timely and proper objection and preservation of rulings thereon should prevail where the basis for the objection is the conduct of the trial judge").

¶ 16    In *People v. Saldivar*, 113 Ill. 2d 256 (1986), the supreme court relaxed the forfeiture rule in order to review the defendant's claim that a trial judge considered an improper factor at sentencing. At the sentencing hearing, the trial judge stated that the defendant's conduct caused death and that a human life was taken, and found that " 'the terrible harm that was caused to the victim' " was the primary statutory factor in aggravation. *Saldivar*, 113 Ill. 2d at 264. On appeal, the defendant argued that the trial court impermissibly considered an element of the offense as an aggravating factor at sentencing (*id.* at 260). In rejecting the State's forfeiture argument, the supreme court focused on the fact that defense counsel had argued "that the victim's death is inherent in the offense" at the sentencing hearing. In declining to apply the forfeiture rule, the court stated that "it was not necessary for counsel to interrupt the judge and point out that he was considering the wrong factors in aggravation, especially in light of the argument that had preceded the ruling. *Id.*

¶ 17    Since *Saldivar*, the supreme court has confirmed the general rule that preserving a claim of sentencing error requires both a contemporaneous objection and a written postsentencing motion, and clarified that *Saldivar* was a case involving "extraordinary circumstances" in which

an objection "would have fallen on deaf ears." (Internal quotation marks omitted.) *People v. McLaurin*, 235 Ill. 2d 478, 488 (2009). In the instant case, there are no "extraordinary circumstances" suggesting that a contemporaneous objection or argument in a postsentencing motion would have "fallen on deaf ears." Accordingly, we find that there is no compelling reason to relax the forfeiture rule.

¶ 18    Defendant also argues that his claim may also be reviewed under the plain error doctrine. The plain error doctrine allows a reviewing court to consider unpreserved claims of error where "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). In the sentencing context, a defendant must show either that "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. Our first inquiry is whether an error occurred. *People v. Smith*, 2016 IL 119659, ¶ 39.

¶ 19    As charged here, aggravated discharge of a firearm is a Class X felony, for which offenders are subject to a term of imprisonment between 10 and 45 years. 720 ILCS 5/24-1.2(b) (West 2012). Thus, defendant's 12-year sentence falls within the low end of the statutory range. See *id.*

¶ 20    During sentencing, the trial court "must exercise care to insure the accuracy of information considered." (Internal quotation marks omitted.) *People v. Jackson*, 149 Ill. 2d 540, 549 (1992). On review, we must look at the entire record, not just "a few words or statements" from the trial court. *People v. Sims*, 403 Ill. App. 3d 9, 24 (2010). There is a strong presumption that the trial court based its sentence on proper legal reasoning, and the defendant retains the burden to affirmatively establish that the sentence was based on an improper consideration. *People v.*

*Dowding*, 388 Ill. App. 3d 936, 942-43 (2009). It is not enough for the defendant to show that the trial court misstated the sentencing evidence; rather, the defendant must demonstrate that the court "relied on the particular" misstatements when it sentenced the defendant. *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 47. The trial court's consideration of an improper factor is not cause for remand if the record demonstrates that the weight placed upon that factor was so insignificant that it did not lead to a greater sentence. *People v. Heider*, 231 Ill. 2d 1, 21 (2008). Although the imposition of sentence is generally a matter of judicial discretion, whether a court relied on an improper factor presents a question of law to be reviewed *de novo*. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49.

¶ 21     Defendant relies on *People v. Wardell*, 230 Ill. App. 3d 1093 (1992), to argue that it is improper for a trial court to speculate that a crime was motivated by race where evidence of such motivation is lacking. In *Wardell*, defendants were convicted of sexual assault and armed robbery, and the trial court commented at sentencing that the defendants decided, after robbing the victims, "to have some more fun with some white girls." *Wardell*, 230 Ill. App. 3d at 1097. We stated that, "Rape incites, as it should, a feeling of outrage but the offensiveness of that act is not transformed by the different skin colors of those persons involved. '[A]ppeals to racial prejudice, whether open or oblique, discredit our justice and are to be condemned.' " *Id.* at 1103 (quoting *People v. Dukett*, 56 Ill. 2d 432, 443 (1974)). As a result, we found the trial court's comments at sentencing evidenced an "improper consideration of the cross-racial nature of the crimes," and vacated the defendants' sentences. *Id.*

¶ 22     In this case, unlike in *Wardell*, defendant fails to establish that the trial court improperly considered race in imposing his sentence. Before sentencing each defendant individually, the court

generally stated that "it is clear to me, at least for two of the defendants . . . this motivation to go out and drive around . . . and end up in the circumstance in which they found themselves . . ." was gang related and that "[i]n particular, I'm troubled by the confronting of these two African-American individuals on the northwest side of the City of Chicago, which was predicated, in this Court's view, on the presumption that because of their ethnicity, that they were somehow affiliated with a gang themselves. I think one of the statements alluded to that." The trial court concluded that "[i]n any event, the crime in its entirety evidences a real disregard for the safety of their fellow citizens in the City of Chicago. And this is, in every sense of the word, an onerous offense."

¶ 23    Since Marco and Diego did not testify, the court was undoubtedly referring to "one of the statements" made by Jose during his trial that "alluded to" a presumption that Edwards was in a gang because of his race. Defendant admits that Jose specifically testified that he assumed that because Edwards and his passenger were African American, they were members of a rival gang. Jose also repeatedly mentioned Edwards' race and testified regarding gang relations between Latinos and African Americans. Defendant's argument that the trial judge's finding was based on an "incomplete recollection of testimony" is unconvincing.

¶ 24    More importantly, the trial court clearly placed the greatest emphasis on the severity of the offense, which was appropriate. See *People v. Willis*, 2013 IL App (1st) 110233, ¶ 123 (quoting *People v. Cox*, 377 Ill. App. 3d 690, 709 (2007) ("The 'seriousness of the crime committed is considered the most important factor in fashioning an appropriate sentence.' ")). At defendant's trial, Edwards testified that defendant drove an SUV, the occupants of which made gang signs, pointed a firearm at him, and chased him. Santiago testified that the SUV ran a red light, crashed into the vehicle carrying Santiago and his children, and continued driving. Yi and Theodorides

testified that an occupant of the SUV shot at them. This evidence supports the court's conclusion that defendant's offense was "onerous" and evidenced "a real disregard" for the safety of others. Because the court did not consider an improper factor in imposing defendant's sentence, no error occurred and defendant's request for plain error review is meritless.

¶ 25    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 26    Affirmed.