2019 IL App (1st) 191571-U

THIRD DIVISION
December 31, 2019

No. 1-19-1571

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* T.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 JD 60017 |
| | ) | |
| T.C., a Minor, | ) | Honorable |
| | ) | Donna L. Cooper, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County adjudicating the minor delinquent is affirmed; the State proved beyond a reasonable doubt respondent was the offender based on the victim's eyewitness identification testimony.  However, we vacate the trial court's sentencing order which did not include a finding that there are no less-restrictive alternatives to secure confinement available to respondent as required by section 5-750 of the Juvenile Court Act, 705 ILCS 405/5-750 (West 2018).  Accordingly, we vacate the order of commitment and remand this cause for sentencing in compliance with the Act and consistent with this order.

¶ 2    Respondent, T.C., a minor, was charged with multiple felonies for robbing Tichina Lewis (Tichina) at gunpoint and forcing her to touch his penis.  Following a bench trial, respondent was found guilty of home invasion, armed robbery, and attempt aggravated criminal sexual assault.

Thereafter, respondent was sentenced by the trial court to commitment at the Department of Juvenile Justice. Respondent filed a direct appeal from the judgment of the trial court arguing (1) that his finding of delinquency should be reversed because it rested entirely on Tichina's identification which he argues was not credible and, in the alternative, (2) the case should be remanded for a new sentencing hearing because the trial court failed to comply with section 5-750 of the Juvenile Court Act, 705 ILCS 405/5-750 (West 2018), before committing respondent to the Department of Juvenile Justice. We affirm the trial court's judgment of delinquency but vacate the order of commitment and remand this cause for sentencing in compliance with the Act as set forth below.

¶ 3                                    BACKGROUND

¶ 4     On February 2, 2018, the State filed a Petition for Adjudication of Wardship charging respondent, T.C., with multiple felonies including home invasion, armed robbery, and attempt aggravated criminal sexual assault in connection with an October 11, 2017 incident that occurred at the home of Tichina and her grandmother, Linda Lewis (Linda).

¶ 5     The bench trial in this matter included witness testimony from Tichina, Linda, Detective Jose Gomez, and Detective McCalpine.

¶ 6     Tichina testified that on October 11, 2017, at approximately 10:00 p.m., she arrived at home from work and was parking her vehicle in the driveway next to her grandmother's car with whom she lived. As she was turning off her car and opening the door two men came up to the car – within arm's reach – with guns drawn and demanded her property. There was a streetlight at the corner of the residence as well as a light on the garage/drive-up path. Tichina described both men and their guns. She testified that one of the men was wearing a black hoodie with the hood covering half of his head and a bandana covering "the tip of [his] nose and then down."

She was able to see the upper half of his face, his eyes, the top of his nose, and the top of his hairline. She identified this man as respondent. Respondent was carrying a gun which she described as "frosted metal at the top" and black toward the bottom with an extended clip that was hanging out of it.

¶ 7    "When they first came up, it was a direct look" in their direction and the men told Tichina to turn around. The men were staggered with respondent standing further from Tichina than the second man. They both had their guns pointed at her, but the closer one had his gun pointed directly at her face, three to four inches away. As the two men were talking to her, Tichina kept turning to glance over at the men who were standing still right at her door. When asked if she was looking at the men's midsection, Tichina stated that her car is low so when she looked up she could see their faces. Tichina confirmed she was looking at the men from their lower chin area up.

¶ 8    Respondent gave the men her phone, purse, and everything she had in the vehicle. One of the men asked her to turn the light on in the vehicle. Respondent reached into her vehicle over Tichina's body so that his upper torso and head were in the vehicle and went through the armrest and glove compartment before stepping back out.

¶ 9    The two men told Tichina they were going into the house with her and walked her toward the residence. The two men followed Tichina with their guns directly at the back of her head. There was a streetlight at the corner of the house and a door light on the top left-hand corner of the door which were both on. As they were walking up to the residence, Tichina was again able to see the men behind her in the reflection of the door window which was tinted providing a "mirrored reflection." When she was turning the corner, she was able to see them from her peripheral. Respondent was no more than two feet away.

¶ 10    As Tichina walked into her house, the lights were on in the front room and throughout the residence. She glanced to her left where a mirror hung on the wall "so [she] could try to see anything." She testified she was able to see both men in the mirror. She saw the face of the second man who was directly behind her "very clearly through the mirror."

¶ 11    The men led Tichina into the kitchen where Linda was standing. The lights in the kitchen were on and remained on throughout the entire incident. The two women were told to stand against the kitchen door with their faces to the door. The men stood behind Tichina and Linda with their guns drawn and demanded money, jewelry, and Linda's phone. Linda told them there was more jewelry in the back of the house and the second man led Linda toward the back of the house. Tichina remained alone in the kitchen with respondent.

¶ 12    Respondent moved next to Tichina by the door and had his gun drawn at her head. He was standing right next to her on her left side facing Tichina. Tichina was able to see respondent's face. "[She] was close enough where [she] could see the pores *** on his nose and his forehead." Tichina testified that certain features for respondent "struck out" namely his "beady eyes" which she described as "dark, dark, dark, dark brown, brownish color *** [d]ark brownish, blackish color." Tichina was also struck by that fact that "[respondent] has like deep pores." She also observed the color and the look of the texture of respondent's hair. They were standing face-to-face. Respondent stated to Tichina that she was going to have sex with him. Tichina responded she could not because she was on her period. He pulled down on the back of her pant pocket attempting to remove Tichina's pants ripping the pocket off the pants which were held in place by her belt. With the gun still to her head, respondent guided Tichina's hand down his pants and onto the skin of his erect penis. Tichina was able to see respondent's face a majority of the time respondent forced her hand down his pants. Linda and the second man

returned to the kitchen, respondent removed Tichina's hand from his pants. Respondent stepped back and Linda was pushed back to the door next to Tichina. Both women were facing the door. Tichina testified she heard some shuffling and a knock on the window followed by the screen door shutting. When she turned around, the two men were gone. The entire incident lasted about 30 to 40 minutes. Because they did not have their phones, Tichina and Linda left the house and drove to the Harvey police station where they told an officer what had happened. Tichina later learned that her debit card, driver's license, and FOID card had been removed from her purse. Jewelry and other items were also taken.

¶ 13    On January 12, 2018, approximately three months after the incident, Tichina was scrolling through Facebook and saw an article that featured a picture of an individual she identified as the second man who was with respondent on the date of the incident. She sent the article to Linda and contacted Detective Gomez of the Harvey Police Department to tell him she saw the article with the photograph of a man that looked like one of the perpetrators.

¶ 14    On January 16, 2018, Tichina went to the Harvey police station where she met with a detective. The detective showed her a Photo Lineup Advisory Form. The form, admitted into to evidence, contained witness instructions as follows:

> "*  The perpetrator may or may not be presented in the lineup.  ***
>
> *  I should not feel compelled to make an identification.  ***
>
> *  The investigation will continue whether or not an identification is made."

Tichina signed the form indicating the administrator explained the instructions, she had also read them and understood them. Tichina also testified she understood the procedure for the photo array and that "the suspect may or may not be in this photo array." Tichina identified the second man that had been with respondent in the photo array which was entered into evidence.

¶ 15    The next day Tichina met with a different detective and viewed a different photo array. An identical Photo Lineup Advisory Form with instructions was signed by Tichina and was admitted into evidence. Tichina testified she went over the same instructions with respect to this photo array as she had received the prior day and that she understood all of the rules written on the form. Tichina identified respondent in the photo array which was admitted into evidence. She testified that the individual identified in the photo array was respondent whom she had identified in court during her earlier testimony. The photo array with respondent's picture contained two rows of three African American young men all appearing to be about the same age with short hair. Respondent's photograph appeared in the center of the second row. The photograph had Tichina's hand drawn circle around it with an arrow pointing down to the following words which had been written by Tichina: "The one who had the scarf on his face. [T]he one who made me touch his penis." Before identifying respondent, she used a piece of paper to cover the bottom half of each individual's face so she could make an accurate identification "to bring back, you know, visually every little detail that I remembered."

¶ 16    At trial, Linda provided similar testimony to Tichina. She testified that Tichina showed her the Facebook article and Linda also believed the man pictured was the other man with respondent the night of the incident. On January 19, 2018, a Harvey detective brought photo arrays to Linda's home for her to view. In the first array, she identified the other man with respondent. As to the second photo array which included respondent's photograph, Linda did not make an identification. She told the detective that he was not the one with her and she was not sure. On the Photo Lineup Advisory Form signed by Linda and entered into evidence it states "[t]he witness made the following statements during the photo *** lineup as to the perpetrator's identity: [Linda] believes [respondent] is the offender, but was not 100% sure[.]"

¶ 17    Detective Jose Gomez, who was working as a detective with the Harvey Police Department at the time, testified that he was assigned to investigate the October 11, 2017 incident. On January 12, 2018, he was contacted by Tichina who told him about the Facebook article containing a photograph of the individual she believed to be the second man with respondent the night of the incident. He was aware of articles on Facebook about a man being arrested in Freeport named Jalen Anderson (Anderson). He created a photo array containing a photograph of Anderson. He also created a second photo array containing respondent's picture. Gomez identified respondent in open court. Gomez had planned on creating several photo arrays with different individuals from the Harvey area photographed with Anderson on social media. Respondent was the first of those photo arrays. He knew respondent was associated with Anderson. He had other detectives act as independent administrators of the photo arrays to Tichina and Linda. Detective Gomez also testified there was a police report which gave a description of the person that entered Tichina and Linda's residence but provided no additional detail with respect to that description.

¶ 18    Detective McCalpine testified he administered a photo array to Tichina on January 17, 2018. He acted as an independent administrator of the photo array and did not have knowledge of who the offender was. He explained to Tichina that she should not feel compelled to make an identification and that the investigation would continue irrespective of whether she made an identification. McCalpine confirmed that when shown the photo array, Tichina made an identification.

¶ 19    Following argument, the trial court found respondent delinquent of home invasion, armed robbery, and attempt aggravated criminal sexual assault. In making his findings the trial court commented on Tichina's identification of respondent stating in relevant part as follows:

"So we had the testimony of Tichina Lewis who indicated what happened to her that night, how she went from outside to inside. I see a picture of the parties' residence. Home lighting is certainly -- interior lighting is certainly different from outside lighting. It's better. It's brighter.

There was testimony that all of this *** began outside. Then it went inside the house where there is kitchen lighting, where there is living room lighting, where there is bedroom lighting, and the parties are able to clearly see the face of the assailants. Once again, the other party with [Anderson] did not take down the bandana.

First of all, I think that between the time the incident occurred and by the time the lineup, it was more like three months ***.

However, she saw this Facebook posting. She contacted the officer. The officer put together photo arrays who indicated that he was putting together associates of [Anderson]. Then we have Ms. Tichina Lewis looking at these photo arrays and making a determination that in the People's Exhibit 2B, she circled [respondent], and in People's 1B, she circled [Anderson]. She was able to delineate what each person did that night. She indicated that the person that took her in the house and kept her by the back door and kept the gun pointed at her and told her that she was going to satisfy him sexually was [respondent].

I understand what her testimony was saying when she said that she could see his pores because, yes, I agree that she was close enough to see his pores. She was close enough to him to see the texture of his hair. She saw his eyes.

- 8 -

Both parties corrected me when I indicated that the bandana was on top of the nose. They indicated that it was below the nose. So it was under the nose covering the mouth. His eyes were available for her to see. And there is something about everybody's eyes that are unique. She indicated that they were dark, dark brown eyes, nearly black. To her they looked like beady eyes. That's just her feeling. That's just her description. You can even say in the world if a person has a child and they'll say, 'Hey, your baby has your eyes.' Eyes are that distinctive. Those are the eyes that she saw. Those are the eyes that she recognized. She like her *** grandmother had the opportunity to say, no, this isn't the right person, but she identified [respondent] right away.

*** Her testimony was credible. She was unimpeached."

¶ 20    Respondent filed a motion to reconsider which was denied.

¶ 21    At respondent's sentencing hearing, the trial court adjudicated respondent a ward of the court and committed him to the Department of Juvenile Justice (DJJ). The trial court did not find that commitment to the DJJ was the least restrictive alternative pursuant to section 5-750(1)(b) of the Act stating "that the commitment to the [DJJ] is the least restrictive alternative based on the evidence -- I'm sorry. Strike that. I cannot check that box."

¶ 22    In addressing the individualized factors set forth in section 5-750(1)(b) of the Act, the trial court stated:

"The sentencing order asks you to consider his age; his background; the result of any assessments, the only assessment I have at this point in time is the social that recommends the Department of Corrections; his educational background, I know there's some issues with that; his physical and emotional

health; his community-based services that have been provided to the minor and whether the minor was compliant with the services.

Because I have to check these boxes, these factors, and that whether the services within the Department of Juvenile Justice will meet the individualized needs of the minor so those are considered, too.

* * * *

That the Court finds that the secure confinement is necessary after review of the following factors:

The age of the minor. Criminal background of the minor. I don't recall any assessments for learning disability and what services were provided, or any physical or mental emotional diagnosis. I believe that -- well, I cannot check the box community-based services have been provided. ERC is not the same as probation. It would be that services within the Department of Juvenile Justice will meet the individualized needs of the minor."

¶ 23    Following his dispositional hearing, respondent filed a motion to reconsider the findings of delinquency which was denied by the trial court after argument. Respondent timely filed a direct appeal of the trial court's finding of delinquency and his commitment to the DJJ. This appeal followed.

¶ 24                                    ANALYSIS

¶ 25    On appeal respondent raises two issues: (1) that his finding of delinquency should be reversed because it rested entirely on Tichina's identification testimony which he argues was not reliable and, in the alternative, (2) that the case should be remanded for a new sentencing hearing

because the trial court failed to comply with section 5-750(1)(b) of the Act before committing respondent to the DJJ.

¶ 26                    I. Identification Testimony Implicating Respondent

¶ 27    Respondent first argues "[t]he State failed to prove beyond a reasonable doubt that [he] was the person who committed the offenses in this case."  Respondent contends that "the only evidence implicating him at trial was the identification testimony of Tichina" which he argues "was highly unreliable" because (1) "the offender was wearing a bandana over his face and a hoodie over his head," (2) "the offenders repeatedly told Tichina not to look at them," (3) Tichina had guns pointed at her throughout the incident[,]" (4) Tichina's "identification was made 97 days after the offense[,]" and (5) "the state did not present any physical or circumstantial evidence to corroborate the identification or connect [respondent] to the crime." For the reasons set forth below, we do not agree.

¶ 28    Respondent's argument concerning the reliability of the eyewitness identification testimony goes to the sufficiency of the evidence.  "When reviewing a challenge to the sufficiency of the evidence, this court considers whether, in viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (Quotations omitted.)  *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007).  Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution; however, where "only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).  The critical inquiry is whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt. *Wheeler*, 226 Ill. 2d at 114.  A reviewing court:

"will not retry a defendant when considering a sufficiency of the evidence challenge. [Citation.] The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court *** that saw and heard the witnesses. [Citation.] Accordingly, a [trial court's] findings concerning credibility are entitled to great weight. [Citation.]" *Id*. at 114-15.

¶ 29    That a trial court accepts the veracity of certain testimony does not; however, guarantee reasonableness and is neither conclusive nor binding though "a fact finder's decision to accept testimony is entitled to deference." *Id*. at 115. Further, it is for the fact finder to judge how flaws or contradictions on the part of a witness' testimony affect the credibility of the testimony in its totality. *Cunningham*, 212 Ill. 2d at 283. "Accordingly, a conviction will only be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justified a reasonable doubt of defendant's guilt." *Wheeler*, 226 Ill. 2d at 115. Having established the appropriate standard of review, we turn to the merits of respondent's appeal.

¶ 30    Where the finding of guilt depends on eyewitness testimony, a "reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 279. Vague or doubtful identifications will not support a conviction, however, a single witness' identification of the accused is sufficient to sustain a conviction. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Even in the face of contradicting alibi testimony, where "the witness had an adequate opportunity to view the accused and the in-court identification is positive and credible" a single witness identification may be deemed sufficient to sustain a conviction. *Id*. "An identification may be positive even though the witness viewed the accused for a short period of time" and "the sufficiency of the

opportunity to observe is for the trier of fact to determine." *People v. Wehrwein*, 190 Ill. App. 3d 35, 39-40 (1989). In assessing the circumstances to be considered in evaluating identification testimony our supreme court has adopted the guidelines set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972), which requires assessment of the following factors:

> "(1) the opportunity the [witness] had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the [witness] at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Slim*, 127 Ill. 2d at 307-08.

¶ 31    The first factor is the "most important" factor (*Wehrwein*, 190 Ill. App. 3d at 39); however, *Biggers* instructs that all factors are to be considered with no single factor conclusively establishing the reliability of identification testimony. *Biggers*, 409 U.S. at 199-00. This court does not "rubber stamp" a trial court's credibility determination; however, "the circumstances that lead us to conclude that *no reasonable* person could have accepted a witnesses's testimony should naturally be few and far between." (Emphasis in original.) *People v. Malkin*, 2019 IL App (1st) 161165, ¶ 19. We are mindful of the authorities cited by respondent questioning the reliability of certain eyewitness identifications and note that even when considering these sources, given the framework in which this evidence is to be analyzed, we would still find the trial court could reasonably accept Tichina's eyewitness testimony as true beyond a reasonable doubt. See *Cunningham*, 212 Ill. 2d at 279.

¶ 32                              Tichina's Opportunity to View

¶ 33    As to the first *Biggers* factor, the opportunity the [witness] had to view the criminal at the time of the crime, respondent argues Tichina's identification "was marred with problems" because "the offender was wearing a bandana over his face" and "a hood that was covering his head to his hairline." Respondent cites *State v. Henderson*, 27 A. 3d 872 (2011), a New Jersey Supreme Court Case which analyzed research and expert testimony concerning different variables impacting witness identifications stating that "[d]isguises and changes in facial features can affect a witnesses' ability to remember and identify a perpetrator" and noting that "[d]isguises as simple as hats have been shown to reduce identification accuracy." *Id.* at 906. However, we are not persuaded by respondent's argument and find this "most important" factor weighs against respondent. see *Wehrwein*, 190 Ill. App. 3d at 39.

¶ 34    Prior to the photo array, Tichina testified as to the four different opportunities she had to view respondent during the course of the 30 to 40-minute October 11, 2017 incident. Tichina testified when the two men first approached her, she got a direct look at respondent and the second man. She described what both men were wearing as well as the guns they were carrying. She stated they were talking to her from arm's length while she sat in her vehicle and thus were in close proximity. She stated they were standing still and she was able to glance at the men and confirmed she could see them from their lower chin area and up. Though it was dark out, there were several sources of light. Specifically, Tichina testified there was a streetlight at the corner of her residence, there was a light on her garage, the light in her vehicle was turned on, and there was a light on at her front door.

¶ 35    Tichina was next able to see the two men as they were walking up to the residence. She testified she could see the men behind her in the reflection of the door window which was tinted providing a "mirrored reflection." Again, the men were illuminated by the door light as well as

the streetlight. Tichina testified she could see them as they turned a corner from her peripheral vision not more than two feet away from her.

¶ 36    The third opportunity Tichina had to observe respondent was as all three of them walked into the front room of her home. Tichina testified the lights in the front room and throughout the residence were on. Tichina testified she glanced into the mirror which hung to her left on the wall. She testified she specifically did this "so [she] could try and see anything."

¶ 37    The fourth, and in our view, most significant opportunity to view respondent occurred when Tichina was alone in the kitchen with respondent. The light in the kitchen was on. While respondent argues the light was not positioned directly over Tichina and respondent, we will not infer that such direct placement of the lighting was necessary in order to have been a well-lit environment. See *Cunningham*, 212 Ill. 2d at 280 (holding that all reasonable inferences from the record are viewed in favor of the prosecution). Nor, would such an inference be consistent with Tichina's testimony as to the lighting and her ability to see respondent's facial details which the trial court found credible.

¶ 38    Tichina testified that respondent moved closer to her so that he was standing right next to her on her left side. She stated he was so close she could see the pores on his nose and forehead. She and respondent were standing face-to-face. Respondent argues that he and Tichina could not have been standing face-to-face based on Tichina's own testimony. We disagree. Given Tichina's description of how the two were standing, Tichina would merely have to have turned her head in order to be face-to-face with respondent. There is no evidence to the contrary and we conclude that this was the case. See *id*. (holding that all reasonable inferences from the record are viewed in favor of the prosecution).

¶ 39    Respondent forced Tichina's hand down his pants and while he was doing this, she could see his face for the majority of the time. Tichina testified she was struck by his eyes and pores. She testified respondent has "beady eyes" which she described as "dark, dark, dark, dark brown, brownish color *** [d]ark brownish, blackish color." Tichina also stated "[respondent] has like deep pores." She also observed the color and look of the texture of respondent's hair.

¶ 40    Though we acknowledge Tichina was not able to view respondent the entire duration of the incident, we are comfortable that she had ample opportunity to view respondent at close proximity under well-lit conditions.

¶ 41                    Tichina's Degree of Attention

¶ 42    We also find the second *Biggers* factor, Tichina's degree of attention, weighs against respondent. On the third opportunity Tichina had to observe respondent, he was standing in the well-lit front room of her home. Tichina testified she specifically glanced into the mirror which hung to her left on the wall "so [she] could try and see anything." Despite any "shock during [the] initial moment[s]" of the encounter respondent concludes would be present and would have impaired Tichina's ability to view and identify the offender, it is clear from her testimony that this was not the case upon her entry into the home. In fact, Tichina took intentional steps to view the offenders to include looking in the mirror when the three individuals entered the front room of her home and recalled this for the trial court explaining her intentions were to get a view of her surroundings.

¶ 43    Moreover, when Tichina and respondent were alone in the kitchen, they were in close proximity. In fact, so close that respondent was able to guide her hand into his pants. As noted above, we are not persuaded by respondent's argument that Tichina and respondent were not face-to-face and that Tichina only had a peripheral view. Additionally, while respondent had on

a bandana, Tichina testified in detail about the aspects of respondent's face she was able to see. This level of detail bolsters the argument that Tichina observed respondent with a high degree of attention. Tichina testified she could see his face for the majority of the time in good lighting and in close proximity. She testified about the pores on respondent's nose and forehead. She testified she was struck by his eyes and pores. She testified about the shape and color of respondent's eyes. Tichina noted his deep pores and testified she observed the color and look of the texture of respondent's hair.

¶ 44    We are also not persuaded by respondent's argument that "Tichina's detailed description of [respondent's] gun supports the notion that she was focused more on the gun pointed at her than on the faces of the offenders." There is nothing in the record to support this conclusion. See *id*. (holding that all reasonable inferences from the record are viewed in favor of the prosecution). Additionally, even the *Henderson* case cited by respondent points out that "weapon-focus studies speak to real-world situations in which a witness observes a threatening object … in an event of short duration" noting that "the longer the duration, the more time the witness had to adapt to the presence of a weapon and focus on other details." (Internal quotations omitted.) *Henderson*, 208 N.J. at 263. This incident occurred over the course of 30 to 40 minutes. As noted above, Tichina testified that she began taking steps to view the offenders and was able to testify as to respondent's appearance in detail.

¶ 45    Finally, when Tichina was provided the photo array containing respondent's photograph after she saw Anderson's picture in a Facebook article approximately three months after the incident, she testified that before identifying respondent, she used a piece of paper to cover the bottom half of each individual's face so she could make an accurate identification "to bring back, you know, visually every little detail that I remembered." On the photo array, Tichina circled

respondent's photograph and wrote that he was "[t]he one who had the scarf on his face. [T]he one who made me touch is penis."

¶ 46    Respondent takes issue with the trial court's statement that the bandana was covering underneath the offender's nose and down rather that the tip of respondent's nose and down stating "[t]his erroneous recollection of the facts is critical where the court was under the impression that Tichina was able to see the offender's nose, a prominent feature on anyone's face." However, Tichina testified that, with the exception of the tip, she was able to see all of respondent's nose including its striking pores. We agree with respondent's statement that the noes is a prominent feature of a person's faces. We note that differences among nose bridges can be significant and are evident even on the six faces pictured within the photo array Tichina was shown in which she identified respondent as being the offender. Accordingly, we do not find it significant that the trial court mistakenly believed Tichina could see the tip of respondent's nose where the balance of respondent's nose was, in fact, visible and the trial court noted Tichina's details concerning various other characteristics of defendant's face and hair to find Tichina's identification reliable.

¶ 47                    Accuracy of Tichina's Prior Description

¶ 48    As to the accuracy of Tichina's prior description of respondent, we find this factor neutral. Respondent acknowledges that at trial no evidence was provided with respect to any initial description given by Tichina of the offender. Because there was no evidence presented at trial regarding the accuracy of the prior description, we cannot assess its accuracy. Therefore, we cannot say that the prior description favors either party. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 111 (stating that where no prior description is given, the third *Biggers* factor does not apply).

¶ 49                                    Tichina's Level of Certainty

¶ 50    We find that the factor concerning Tichina's level of certainty also weighs against respondent.  Respondent suggests that we afford this factor little weight citing Justices Marshall and Brennan's dissent in *Mason v. Brathwaite*, 432 U.S. 98, 130 (1977).  However, the majority opinion clearly gives weight to this factor and we will not depart from the United States Supreme Court's majority decision in *Mason*, 432 U.S. at 115, and *Biggers*, 409 U.S. 188, or our supreme court's decision in *Slim*, 127 Ill. 2d at 307-08, which require an assessment of "the level of certainty demonstrated by the [witness] at the identification confrontation." *Id*., 127 Ill. 2d at 307-08.

¶ 51    Here, Tichina testified clearly and unequivocally throughout the trial that respondent was the offender wearing the bandana during the incident and identified respondent as the same individual she circled in the photo array.  Tichina testified about the four opportunities she had to observe respondent during the 30 to 40-minute occurrence.  She testified in detail about the features on respondent's face which she could see as well as his hairline and the look and texture of his hair.

¶ 52    When shown the double-blind photo array containing respondent's photograph, Tichina was given instructions by the detectives and also read the instructions on the Photo Lineup Advisory Form which stated that the perpetrator may not be present on the lineup and that she should not feel compelled to make an identification.  This was the second time she had gone over these instructions, having received the same instructions the previous day when she identified the photograph in the photo array of Anderson.  Tichina testified she understood the photo array instructions on both occasions.  In identifying respondent in the photo array, Tichina took steps "to bring back, you know, visually every little detail that I remembered" by covering the portion

of each individual's face that would have been covered by the bandana respondent was wearing.

McCalpine confirmed that when shown the photo array, Tichina made an identification wherein

she circled respondent's photograph and wrote that this was "[t]he one who had the scarf on his

face. [T]he one who made me touch his penis." There is no evidence in the record that Tichina

waivered or was uncertain as to the identification. See *Cunningham*, 212 Ill. 2d at 280 (holding

that all reasonable inferences from the record are viewed in favor of the prosecution).

¶ 53                    The Time Between the Crime and Tichina's Identification

¶ 54    The final factor concerning the time between the crime and Tichina's identification of

respondent also weighs against respondent. Citing *Henderson*, 208 N.J. at 267, respondent

argues this final factor favors respondent because the 97-day lapse of time "between the incident

and the identification creates a significant risk of misidentification." However, even the court in

*Henderson* points out that "researchers cannot pinpoint precisely when a person's recall becomes

unreliable." *Id*.

¶ 55    Here, approximately three months transpired between the incident and Tichina's

identification of respondent in the photo array. The State points to several cases, including our

supreme court's decision in *People v. Rodgers*, 53 Ill. 2d 207 (1972), where identifications were

deemed reliable despite substantially more time elapsing. Notwithstanding respondent's

arguments to the contrary, we find *Rodgers* to be similar to the instant case. In *Rodgers* the court

found the eyewitness identification to be sufficient despite the suggestive nature of the

identification which took place approximately two years after the crime and where the

eyewitness was shown a single photograph of the defendant which had a drawing of a hat similar

to that worn by the assailant. *Id*. at 212. The court reasoned that despite the uncommendable

photograph identification procedure employed, there was independent evidence to support the

witness identification to include they witness' (1) "excellent opportunity to observe the defendant at the time of the crime[;]" (2) his opportunity to view the defendant during the approximately 20 minute duration of the crime "face to face in good lighting on three separate occasions[;]" and the fact that he immediately identified the defendant at the police lineup, recognized the defendant's voice, and was positive of his identification during cross-examination. *Id*. at 213.

¶ 56    Here only three months elapsed between the identification and the crime as opposed to the two years in *Rogers*. While respondent disagrees, as set forth above, Tichina was able to view respondent for the majority of the time over the course of 30 to 40 minutes, in close proximity, and in good lighting. Tichina viewed respondent on four different occasions and was face-to-face with respondent on one of those occasions. It was three months after the incident that Tichina independently identified Anderson while scrolling through her Facebook and alerted officers who then put together a photo array which included respondent, who was associated with Anderson. Accordingly, we do not agree that the three-month lapse between the crime and Tichina's identification of respondent undermined the reliability of her identification of respondent.

¶ 57    For the reasons set forth above, in light of the record we cannot say that no fact finder could reasonably accept Tichina's identification testimony as true beyond a reasonable doubt. See *Cunningham*, 212 Ill. 2d at 279. Thus, we affirm the trial court's delinquency judgment and turn to respondent's claims of error with respect to his sentencing.

¶ 58                              II. Respondent's Sentencing Hearing

¶ 59    Respondent raises two arguments in support of his claim that a new sentencing hearing is required. Specifically, respondent argues that (1) "the judge failed to comply with its duty under

section 5-750(1)(b) [to] determine whether 'commitment to the [DJJ] is the least restrictive alternative' " pursuant to the Act and (2) the trial court did not consider the individualized factors under section 5/750 of the Act. "The question of whether the court complied with statutory requirements is a question of law we review *de novo*." *In re Ashley C.*, 2014 IL App (4th) 131014, ¶ 22.

¶ 60     The defendant askes that we review the trial court's alleged sentencing issues but did not object and preserve these issues for appeal. Notwithstanding, here the State concedes "that the trial court committed plain error in sentencing respondent to the DJJ without explicitly making a finding that the DJJ was the least-restrictive alternative and agrees that this case should be remanded for a new dispositional hearing.

¶ 61     The finding that the DJJ is the least restrictive alternative is a requirement of section 5-750 of the Act. The Act permits the commitment of a juvenile to the DJJ when a delinquent has been adjudged a ward of the court under the Act and it finds that:

> "(a) his or her parents, guardian or legal custodian are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor, or are unwilling to do so, and the best interests of the minor and the public will not be served by placement under Section 5-740, or it is necessary to ensure the protection of the public from the consequences of criminal activity of the delinquent; and (b) *commitment to the Department of Juvenile Justice is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful in locating a less restrictive alternative to secure confinement.*" (Emphasis added.) 705 ILCS 405/5-750(1) (West 2018).

¶ 62   "The plain-error doctrine allows a reviewing court to consider unpreserved error when either: (1) an error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) an error occurs that is so serious it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *In re Samantha V.*, 234 Ill. 2d 359, 368 (2009).

¶ 63   With respect to application of the plain-error doctrine, this court has stated that "[s]entencing issues are regarded as matters affecting a defendant's substantial rights and are thus excepted from the doctrine of waiver." *People v. Baaree*, 315 Ill. App. 3d 1049, 1050 (2000).  Moreover, the fourth district in *In re Raheem M.*, 2013 IL App (4th) 130585, held that "the trial court's failure to require and consider evidence of less restrictive alternatives to secure confinement, efforts made to find less restrictive alternatives, and evidence why those efforts were unsuccessful, if so, before sentencing respondent to the [DJJ] constitutes such a serious error we excuse forfeiture based on the second prong of plain-error analysis." *Id.* at ¶ 52.

¶ 64   Citing *In re Raheem M.*, this court agreed "the trial court has discretion to commit defendant to the DJJ, but it may only do so if it first makes a finding that there are no less-restrictive alternatives to secure confinement available to defendant." *In re Henry P.*, 2014 IL App (1st) 130241, ¶ 57.  Similar to *In re Raheem M.* were the court found the trial court's failure to consider evidence of a less restrictive alternative to secure confinement, we also find a trial court's failure to make the required finding under that Act based on such evidence to be a sentencing issue affecting defendant's substantial rights excepted from the doctrine of waiver. See *In re Raheem M.*, 2013 IL App (4th) 130585, ¶ 52; see also *Baaree*, 315 Ill. App. 3d at 1050.

¶ 65    Because the trial court did not find that commitment to the DJJ was the least-restrictive alternative, we remand for the trial court for a new dispositional hearing in compliance with the Act. 705 ILCS 405/5-750(1) (West 2018).

¶ 66    With respect to respondent's second argument concerning sentencing - that the trial court failed to consider the individualized factors under section 5/750 of the Act - we find no error. See *In re Samantha V.*, 234 Ill. 2d at 368 (holding that a reviewing court must first determine whether any error occurred before it can apply the plain-error doctrine).

¶ 67    The Act provides that before a trial court can commit a minor to the DJJ, it is required to first "make a finding that secure confinement is necessary" after reviewing the following individualized factors:

> "(A) Age of the minor.
>
> (B) Criminal background of the minor.
>
> (C) Review of results of any assessments of the minor, including child centered assessments such as the CANS.
>
> (D) Educational background of the minor, indicating whether the minor has ever been assessed for a learning disability, and if so what services were provided as well as any disciplinary incidents at school.
>
> (E) Physical, mental and emotional health of the minor, indicating whether the minor has ever been diagnosed with a health issue and if so what services were provided and whether the minor was compliant with services.
>
> (F) Community based services that have been provided to the minor, and whether the minor was compliant with the services, and the reason the services were unsuccessful.

(G) Services within the Department of Juvenile Justice that will meet the individualized needs of the minor." 705 ILCS 405/5-750(1) (West 2018).

¶ 68    In determining whether secured confinement is necessary, the Act requires a trial court to review each of the enumerated individualized factors. See *id.* However, section 5-750 of the Act only requires a trial court to make a finding that secure confinement is necessary, but "does *not* require that it state every reason that it made the finding." (Emphasis added.) *In re Henry P.*, 2014 IL App (1st) 130241, ¶ 61.

¶ 69    Respondent specifically argues there is no evidence that the trial court considered the individualized factors outlined in the Act as they applied to respondent. However, the record indicates otherwise. The trial court specifically listed each factor and noted its obligation to consider each one as part of the sentencing order. The court commented on certain factors noting that it had a social assessment which recommended the Department of Corrections. Here we point out that the record does not contain the social assessment referenced by the trial court. Where the appellant has failed to provide a sufficient record, we will presume that the order entered by the trial court was in conformity with the law and had sufficient factual basis. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 70    Moreover, the trial court stated there were some issues with respondent's educational background indicating that this factor was considered. The court went on to state:

"the Court finds that the secure confinement is necessary after review of the following factors:

The age of the minor. Criminal background of the minor. I don't recall any assessments for learning disability and what services were provided, or any physical or mental emotional diagnosis. I believe that -- well, I cannot check the

> box community-based services have been provided. ERC is not the same as probation. It would be that services within the Department of Juvenile Justice will meet the individualized needs of the minor."

¶ 71    As set forth above, the trial court confirmed that it had considered each of the individualized factors. There is nothing in the record to suggest otherwise. We do not agree that the trial court's failure to check each individualized factor contained in the commitment order confirms that the trial court did not review those factors as respondent suggests. Rather, the trial court only checked those boxes which were relevant to its finding "that secure commitment is necessary." However, even if respondent's argument that the checked boxes represented confirmation of the trial court's consideration of the factors was correct, such a finding would be contrary to the trial court's oral pronouncements which are controlling. See *People v. Roberson*, 401 Ill. App. 3d 758, 774 (2010) (holding that a trial court's oral pronouncement controls over a conflicting written order).

¶ 72                                      CONCLUSION

¶ 73    For the foregoing reasons, the judgment of delinquency of the circuit court of Cook County is affirmed. We vacate respondent's order of commitment and remand this cause for a new dispositional hearing in compliance with the Act and consistent with this order.

¶ 74    Affirmed in part and vacated in part, cause remanded with instructions.